## Hileman et al. *versus* Bouslaugh.

A conveyance of real estate to a married woman "during her natural life and after her decease to the heirs of her body and to them and their heirs and assigns forever," creates an estate tail in such married woman, which at her death, descends to her eldest son, as heir at common law.

The rule in Shelly's case has always been recognized by this court as the law. The operation of the rule is to give to the ancestor an estate for life, and by force of the devise to his heirs, general or special, the inheritance also, by conferring the remainder on him, as the source from which alone their inheritable blood can spring.

In a *will*, the legal force of the word *heirs*, may sometimes be controlled by the context, but not so in a deed; it is, in a deed, a term of art.

The difference between this case and Shelly's case is, that here, there is no limitation over, in default of issue; in Shelly's case there was; but this difference is immaterial. Superadded words of limitation, which import *the same course of descent* are inoperative in a deed, and perhaps in a will.

The want of a limitation over, in the event of a failure of issue of the first taker, evinces no more than an intent, that the inheritance should be, in the particular tenant, if he should have issue; and does not imply that the grantor did not design to create an estate tail, in the grantee.

An executed conveyance of a legal estate, to a married woman, passes to her a legal and not an equitable estate.

An instrument cannot be partly a deed, and partly of a testamentary character; it must be, exclusively, a will, or it is a deed, as distinguished from a will.

The construction of a deed is not to be relaxed by any thing in the *will* of the grantor, which preceded it. It is not competent to shew an actual intention, contrary to the legal effect of the deed.

ERROR to the Common Pleas of *Blair county*.

Action of Ejectment—This was an action of Ejectment for

[Hileman et al. *v.* Bouslaugh.]

about 216 acres of land, in the county of Blair, formerly Huntingdon, by Jacob R. Bouslaugh *vs.* Henry Hileman, and Michael Hileman and Sarah his wife. A case was stated.

The plaintiff was the eldest child of Esther Bouslaugh and Sebastian Bouslaugh, and he claimed the land, as tenant in tail, under a deed from his grand father, Joseph Rentch, to Esther Bouslaugh, his mother, which will be hereafter mentioned; said deed being dated on the ninth day of November, 1793.

The question at issue was whether Esther Bouslaugh took under the said deed, an *estate tail*, or merely an estate *for life*. If she took an estate tail, it descended, *secundum formam doni*, to the eldest son, in exclusion of the other children; the statutes of descent of 1794, and of 1833, not applying to estates, which have been "sold or disposed of by will," or otherwise limited by marriage settlement, and therefore not to estates' tail: see said acts and 1 *Yeates* 313–15. At the time of the making of the said deed, Esther and Sebastian Bouslaugh had four children, viz : Jacob, the plaintiff, the eldest, and three daughters; after the deed was made, she had by her said husband, five other children, four daughters and one son; one of the daughters born after the execution of the deed, was married to Henry Hileman, and another to Michael Hileman, who were defendants in this suit.

It was contended on the part of defendants below, that the said Esther took, under the deed, an estate *for life only*, and that on her death, the fee vested under the deed, in all of her nine children, of whom the plaintiff was one, and entitled only to *one-ninth* part of the premises.

His Honor, Judge BLACK, charged the jury that in his opinion, Esther Bouslaugh took *an estate tail* under the deed, which descended to the plaintiff as her eldest son, in exclusion of her other children, and that he had a legal right to judgment in his favor.

Judgment was entered accordingly on the case stated.

The deed by Joseph Rentch was as follows:

*Joseph Rentch,*　⎫　Deed. This Indenture made this ninth day
　　to　　⎬　of November, in the year of our Lord one
*Esther Bouslaugh.*　⎭　thousand seven hundred and ninety-three, between Joseph Rentch of Franklin county and state of Pennsylvania, of the one part, and Esther Bouslaugh, now the wife of a certain Sebastian Bouslaugh, she being daughter of the aforesaid Joseph Rentch of the other part, of Huntingdon county, and state aforesaid—Witnesseth that Joseph Rentch, for and in consideration of the sum of ten shillings, current money of Pennsylvania, well and truly to him in hand paid, and for the consideration of the good will and affection he bears for his daughter, and as a *lagaicee* to her, he the aforesaid Joseph Rentch, acknowledged the

VOL. I.—W.

above consideration, and is therewith fully satisfied and contented, and of every part and parcel doth acquit and discharge the said Esther Bouslaugh and her heirs ; he the said Joseph Rentch hath by these presents given, granted, bargained, sold, aliened, enfeoffed and confirmed, and doth by these presents absolutely grant, bargain and make over unto the said Esther Bouslaugh, DUREING HER NATURAL LIFE AND AFTER HER DECEASE *to the heirs of her body*, AND TO THEM AND THEIR HEIRS AND ASSIGNS FOREVER, all that part of a tract of land, called Henry Farm, formerly situate in the county of Cumberland, and now in Huntingdon county, and state of Pennsylvania; on a large run that empties into Franstown branch of Juniata river, and included in the following courses, viz : [here follows description;] containing and laid out for two hundred and sixteen acres of land, together with all and singular the before mentioned lands and premises, and every part and parcel thereof to have and to hold the aforesaid two hundred and sixteen acres of land unto her the said Esther Bouslaugh, DUREING HER NATURAL LIFE AND THEN TO THE HEIRS OF HER BODY AND TO THEIR HEIRS AND ASSIGNS FOREVER; and the said Joseph Rentch and his heirs doth further covenant, grant and agree to and with the said Esther Bouslaugh, and then her heirs and assigns, that she and they shall and may from time to time and at all times forever hereafter, have, hold, occupy and possess and enjoy the aforesaid bargained land and tenement hereditaments and appurtenances as before and above mentioned, that is to say my daughter Esther Bouslaugh to enjoy and possess the aforesaid land and premises DUREING HER NATURAL LIFE, AND THEN AFTER HER DECEASE, THEN TO THE HEIRS OF HER BODY, TO THEM, THEIR HEIRS AND ASSIGNS FOREVER, and the said Joseph Rentch and his heirs, executors, administrators, shall and will warrant and for ever defend the aforesaid lands and premises with all the appurtenances and profits and advantages thereunto belonging, or in any wise thereunto appertaining from all persons that shall or will lay any right, title, interest, claim or demand, to any part or parcel thereof by from or under him and his heirs, unto her and her heirs and assigns for ever.   In witness whereunto the said Joseph Rentch hath hereunto set his hand and affixed his seal the day and year first above written.

JOSEPH RENTCH, [SEAL.]

Signed, sealed and delivered in the presence of
*Joseph Vanlear*,
*John Goulding.*

Recorded in Huntingdon county, on the 15th November, 1793.

The parties above named agreed on various facts, as a case stated, the same to be considered in the nature of a special verdict rendered in said action, and either party or any party in interest,

to have a right to take a writ of error to the judgment rendered thereon by the court of Common Pleas.

That Joseph Rentch, (being the owner of the land in dispute, in fee simple,) made his deed bearing date the 9th of November, 1793, conveying to his daughter, Esther Bouslaugh, wife of Sebastian Bouslaugh, a tract of land therein described, containing two hundred and sixteen acres, and then in Huntingdon county, in and by the words in said deed contained.

That Jacob R. Bouslaugh, the above named plaintiff, was and is the oldest son of the said Esther Bouslaugh and Sebastian Bouslaugh, the said Esther never having been but once married.

That the said Esther Bouslaugh died in the winter of 1843 or 4, before the institution of this suit, the said Sebastian Bouslaugh having died before the said Esther.

That the said Joseph Rentch made his said deed dated the 9th of November, 1793, to his said daughter, Esther Bouslaugh, then a *femme covert*, and wife of the said Sebastian Bouslaugh, which deed was duly recorded in Huntingdon county, on the 15th November, 1793.

That he also made his last will and testament dated in the caption of it, the 21st day of May, 1793, but in the conclusion of it, the 24th day of May, 1793, which said will was proved before the Register of Huntingdon county, on the 8th of September, 1804, referring to the above and before stated deed and the deeds hereinafter stated.

That he also made deeds to his sons for lands described in the several deeds.

That the said Esther, daughter of the said Joseph Rentch, married the said Sebastian Bouslaugh without the consent of her father, the said Joseph Rentch, having eloped with the said Sebastian to be married, and the said Joseph Rentch never became reconciled to the said Sebastian Bouslaugh.

That at the time of the making of the herein before stated will of the said Joseph Rentch, and of the deed before stated, to Esther Bouslough, &c. the said Esther Bouslaugh had four children living, the issue of the marriage between her and the said Sebastian Bouslaugh, all known to the said Joseph Rentch, viz: Jacob R. Bouslaugh, the plaintiff in this ejectment; Elizabeth, dead, leaving lawful issue still alive; Margaret, living, who lived with and was raised by her grandfather, the said Joseph Rentch, until the time of his death; Catharine, dead, leaving issue one child still living. That after the making of this said will and deed, the said Esther and Sebastian Bouslaugh had the *five following named children*, viz: Hetty, who intermarried with Henry Hileman, one of the defendants in this ejectment. They are both living and residing on the land described in the deed to Esther Bouslaugh. Mary, living. Joseph, who is still living. Susan, dead, leaving

[Hileman et al. *v.* Bouslaugh.]

lawful issue yet alive. And Sarah, who intermarried with Michael Hileman. She and her husband are both living, and are two of the defendants named in this ejectment.

That after the death of the said Sebastian Bouslaugh, the said Esther Bouslaugh made her testament and last will, bearing date the 18th day of Debember, A. D. 1841, devising the tract of land described in the deed herein before stated, from the said Joseph Rentch to the said Esther Bouslaugh, to her daughter, the herein before named Sarah Hileman, wife of the said Michael Hileman, &c. the said Sarah and Michael being two of the defendants in this action of ejectment. (Said will proven before the Register of Huntingdon county, on the 24th of January, A. D. 1844.)

That the said Esther Bouslaugh died in the possession of the land aforesaid, bearing no other children than those herein before named.

If, on the before stated facts, the said plaintiff in this action is in law entitled to recover the whole of the said tract of land for which this action is brought and which is conveyed by and described in the said deed from the said Joseph Rentch *to* the said Esther Bouslaugh as the tenant in tail or otherwise under said deed, then judgment to be entered for the plaintiff in the case *for the whole of said land.* But if on the before stated facts, the said plaintiff is only entitled in law to recover a proportionate part of the said tract of land for which this action is brought as one of the said children and heirs of the said Esther Bouslaugh, then judgment to be entered in this case for the said plaintiff *for the one undivided ninth part* of said tract of land; or if on the before stated facts, the said plaintiff is not entitled in law to recover any part of the said tract of land for which this action is brought, then judgment to be entered for the defendants.

The part of the will of Joseph Rentch, which refers to the property in question, is as follows:

*Item.*—I have likewise conveyed and made over to my daughter Esther Bouslaugh, two hundred and sixteen acres of land, as part of her *Lagaice* which I have charged her the sum of two hundred and sixty pounds for and have discharged the same in *lew* of the two hundred and sixty pounds I have willed my three daughters heretofore mentioned.

The case was argued in 1849, by *Miles,* for Hileman and others, plaintiffs in error.—He contended that Esther Bouslaugh took, under the deed from her father, but an estate *for life,* and that her children, living at the date of the deed, under the *description as heirs of her body,* took as purchasers, a vested remainder in fee simple, as tenants in common, which opened from time to time, to let in the after born children, at the dates of their respective births: 4 *Johns. Rep.* 64; 1 *S.* & *R.* 375–7; 10 *S.* & *R.* 298.

That the intention of Joseph Rentch was to give his daughter but a *life estate*, as gathered from the whole words used; she had given him offence by her intermarriage with Sebastian Bouslaugh, and it is stated as a fact in the special verdict, that he never became reconciled to her husband. He designed to deny to her husband the marital rights he would have had in a fee, had an estate in fee been given to his wife; these. are extrinsic facts, but the law does not exclude extrinsic evidence, in such a case as this: *Powell on Devises*, 245; *Wigram on Wills*, 68–73.

The intention of the grantor is to be the rule of interpretation in deeds, as it is in wills: 1 *Bulst.* 175; *Hob.* 304; 1 *Shep. Touch.* 86; 1 *Rawle* 389; 3 *Bin.* 143–9; 1 *Yeates* 520; *do.* 394–8; 4 *Dal.* 440; 3 *W.* & *S.* 160; 2 *do.* 24; 3 *Watts* 499; 5 *Watts* 41; 7 *Barr* 445; 4 *Kent* 228; 2 *Atk.* 580; 3 *do.* 136; 2 *Bos.* & *Pul.* 14.

The counsel contended that the rule in Shelly's case should not be *extended*, but that it should be confined to cases *literally* within it: 4 *Burr.* 2579; Perrin *vs.* Blake. 4 *Pa. Law Journal*, 197. But he contended that this case was not within that rule.

1. Because an express estate *for life* and no more is given to Esther Bouslaugh, by the deed, and where an estate for life is expressly given, it cannot be enlarged, except it appears manifest that the intent of the testator was to confer a larger estate: 4 *Amer. Com. Law*, 416; 1 *P. Wms.* 54; 2 *Bl.* 888; 2 *Burrows* 1107; 1 *Ld. Ray* 204; 10 *S.* & *R.* 298; 3 *do.* 439.

2. Because there are words of superadded limitation, engrafted on the words "heirs of her body," viz: and "to their heirs and assigns forever." There are words of *explanation*, annexed to the words "heirs of her body," viz: "*during* her natural life," and "than after her decease then," &c. These words were introduced to qualify and explain the terms "heirs of her body." That they evidence an effort in the testator to mark the time when the life estate was to end, and the new inheritance, or estate in remainder, to begin. That in this case there was *no limitation over*, after a failure of issue of Mrs. Bouslaugh; that the superadded or engrafted limitation was not *itself a limitation over;* and that there was nothing to shew an intention to keep the estate *in her blood*, except the words "the heirs of her body;" and that these words were explained and qualified by those which followed; that the absence of a limitation over, went to shew that the grantor did not design to designate "the heirs of her body," as the stock of a *new descent.* He referred to 1 *Lord Raym.* 203–5; 2 *do.* 1561; 3 *Keb.* 99–100; 2 *Bur.* 1107–8; 4 *Amer. Com. Law*, 398; 4 *Kent* 220–2; 3 *Bin.* 158; 10 *Ser.* & *Lowber Eng. C. L.* 724; 4 *Barn.* & *Cr.* 610, 11, 621; 10 *Eng. C. L.* 729; 12 *do.* 392; 5 *Barn.* & *Cr.* 866. The superadded words of limitation would give the inheritance to the heirs *general*, comprehending the

whole class of persons, who could, in any event, inherit by reason of their blood connexion with the ancestor; under them, the inheritance might vest in persons who never could take, under the first words, as heirs of the body of Mrs. Bouslaugh.

The covenant for quiet enjoyment shews a discrimination between *Esther Bouslaugh and her heirs*, (or children,) and *the assigns* spoken of. The covenant is to Mrs. Bouslaugh, and *then* to her children, (under the term heirs,) and *their* assigns, for their quiet enjoyment forever. It shews that an *estate tail* was not in the contemplation of Joseph Rentch. That covenant would forever prevent him or his heirs, from disturbing *the assigns* of the heirs or children.

The word *heirs* used in a deed or will in Pennsylvania, ought to be construed with reference *to our system of descents*; 4 *Law Journal* 202, Judge BELL in Crosby *vs.* Davis; Judge YEATES in 3 *Bin.* 158; 2 *Yeates* 54; 2 *Bin.* 20; 10 *Watts*, 190–1.

Apart from any construction drawn from the different parts of the deed, the words of limitation themselves are descriptive of *a technical remainder.* All that is necessary to bring this case within the literal terms of the definition of a *remainder*, is the names of the persons meant by the words 'the heirs of her body;' *Hayes on Heirs in Tail*, 7 *Law Lib.* 21.

This case is not within the rule in Shelly's case, because Esther Bouslaugh was a feme covert at the time of the execution of the deed; 2 *Story's Eq.* 764.

The case ought not to be held to be within the rule in Shelly's case, and thereby work the life estate into an estate tail, because of her legal incapacity to bar the entailment, and thus enable her to make an equal distribution among her children.

The rule in Shelly's case does not apply, because whatever estate Esther Bouslaugh had, was an *equitable* estate, taken by the permission of her husband, which equity would compel him to give, but the estate limited to "the heirs of her body," was a *legal* estate; and that the rule operates only where the life estate and the subsequent limitations are of the *same nature*, both legal or both equitable, 4 *Penn. Law Journal*, 197–8; *Fearne* 59; *Hayes on Real Estate*, 3; 7 *Law Library*; 4 *Kent* 230; 7 *D. & E.* 342, 438; 1 *S. & R.* 376, where the deed resembled the deed in this case.

That Mrs. Bouslaugh's estate ought to be held to have been an *equitable* estate, until the death of her husband.

He contended that the judgment should be reversed, and judgment rendered in favor of the plaintiff, for one undivided ninth part of the premises in dispute.

*Bell*, was for defendant in error.

[Hileman et al. *v.* Bouslaugh.]

The opinion of the court was delivered, June 3, 1850, by

GIBSON, C. J.—The rule in Shelly's case ill deserves the epithets bestowed on it in the argument. Though of feudal origin, it is not a relic of barbarism, or a part of the rubbish of the dark ages. It is part of a system; an artificial one, it is true, but still a system, and a complete one. The use of it, while fiefs were predominant, was to secure the fruits of the tenure, by preventing the ancestor from passing the estate to the heir, as a purchaser, through a chasm in the descent, disencumbered of the burthens incident to it as an heritance; but Mr. Hargrave, Mr. Justice Blackstone, Mr. Fearne, Chief Baron Gilbert, Lord Chancellor Parker, and Lord Mansfield, ascribe it to concomitant objects of more or less value at this day; among them, the unfettering of estates, by vesting the inheritance in the ancestor, and making it alienable a generation sooner than it would otherwise be. However that may be, it happily falls in with the current of our policy. By turning a limitation for life, with remainder to heirs of the body, into an estate tail, it is the hand-maid, not only of Taltarum's case, but of our statute for barring entails by a deed acknowledged in court; and where the limitation is to heirs general, it cuts off what would otherwise be a contingent remainder, destructible only by a common recovery. In a masterly disquisition on the principles of expounding dispositions of real estate, Mr. Hayes, who has sounded the profoundest depths of the subject, is by no means clear that the rule ought to be abolished even by the legislature; and Mr. Hargrave shows, in one of his tracts, that to engraft purchase on descent, would produce an amphibious species of inheritance, and confound a settled distinction in the law of estates. It is admitted that the rule subverts a particular intention in, perhaps, every instance; for, as was said in Roe *vs.* Bedford, 4 *Maule & Selw.* 363, it is proof against even an express declaration that the heirs shall take as purchasers. But it is an intention which the law cannot indulge consistently with the testator's general plan, and which is necessarily subordinate to it. It is an intention to create an inalienable estate tail in the first donee; and to invert the rule of interpretation, by making the general intention subservient to the particular one. A donor is no more competent to make tenancy for life a source of inheritable succession, than he is competent to create a perpetuity, or a new canon of descent. The rule is too intimately connected with the doctrine of estates, to be separated from it without breaking the ligaments of property. It prevails in Maryland, Georgia, Tennessee, as well as, perhaps, in most of the other states; and it prevailed in New York till it was abolished by statute. We have no such statute; and it has always been recognized by this court, as a rule of property.

A *devisor* who uses words of limitation in an improper sense,

[Hileman et al. *v.* Bouslaugh.]

may so explain the meaning of them by other words in the context, as to exclude his devise from the rule; for it operates only on the intention, when it has been ascertained, not on the meaning of the words used to express it. The ascertainment is left to the ordinary rules of construction peculiar to wills; but when the intention, thus ascertained, is found to be within the rule, there is but one way; it admits not of exceptions. It is to the application of those ordinary rules, sometimes controlling the meaning on weak and inconclusive grounds, and not to the nature of of the particular rule—which is, in truth, not a rule of construction—that the discrepance of the decisions is attributable. The question on a will is not whether the testator intended that the rule should not operate, for that is not subject to his power, but whether he used the words, "heirs of the body," as synonymous with the word "children," or its proper equivalent. By not adverting to this, the rule has sometimes been thought to be a flexible, instead of an unbending one. But can technical words of limitation, in an executed conveyance of the legal estate by a common law deed, be qualified by implication or the context? In moulding legal conveyances to give effect to executory trusts in marriage settlements, a chancellor interprets the deed as freely as he would interpret a will; because it contains no more than hints or instructions for a formal settlement; and he consequently treats an executory limitation to heirs of the body, as a direction to dispose of the estate at law, in strict settlement, by giving estates to first and other sons in tail. Lord Macclesfield held, in Trevor *vs.* Trevor, 1 *P. Wms.* 622, that the case is stronger on articles than on a will; because articles are only heads or minutes of the agreement; and that they ought to be so modelled, in executing them, as to give effect to the actual intention. But it has never been supposed that technical words of limitation in a conveyance—and heirs of the body are such—can be controlled by any thing whatever. It was held in Roe *vs.* Bedford, 4 *M.* & *S.* 362, on the authority of Lord Hardwicke, in Bagshaw *vs.* Spencer, that even in a devise of legal estate, the words must be taken as they stand, according to their strict legal signification; and the same thing, essentially, was said by Chief Justice Bridgman, in Rundale *vs.* Eely, *Carter*, 170. It is said, in *Sheppard's Touchstone*, to be peculiar to wills, that a devise is to be liberally expounded, in order to pursue the meaning of the devisor, who may, for want of assistance, have omitted the legal and proper phrases; insomuch as to sustain a fee simple without words of inheritance, or a fee tail without words of procreation, or an estate by implication; and that a will is to be construed rather on its circumstances, than on any principle of law. On this distinction was ruled Ellmaker *vs.* Ellmaker, 4 *Watts*, 89, in which the word dower, embracing, in the popular sense, every thing which belongs to the widow of an

intestate husband, was restrained, in a deed, to real estate. What, then, is the legal meaning of the words, heirs of the body? The word issue, which was held, in the Earl of Oxford *vs.* Churchill, 3 *Ves. & Bea.* 67, to be ambiguous in a will, is always a word of particular designation in a deed; and it follows that heirs of the body are words of limitation in it. In King *vs.* Melling, 1 *Vent.* 226, Twisden, Justice, said that the words, issue of the body, in a conveyance executed, make not an estate tail, more than would the word children; and Hale, Justice, said that, in creating an estate tail by will, the intention is the law of the case; but that in a conveyance by deed, the word heirs is a term of art; and the cause was ruled on that ground. In a will, the legal force of the word heirs may be controlled by the context evincing such a demonstrative intention to misapply it, as cannot be mistaken: in an executed conveyance, never. It is significant, that in the eighty-two cases comprised in the analytical tables of Mr. Hayes, Shelly''s alone was on a deed; and that the question was not on the meaning of the words, but on the power of the rule to control it. Since, then, the present is the only one, in England or America, except Baughman *vs.* Baughman, 2 *Yeates*, 410, which has come before the court on a conveyance executed; and the latter seems to have been ruled on the distinction now taken. The question, in every other, has been on a will, or an appointment in the nature of a will. Mr. Hayes remarks that he introduced Shelly's case into his tables only because it had given name to the rule. But it is essentially the case before us. The limitations were to A for life—remainder to the use of the heirs of his body, and to the heirs males of the body of such heirs males; and in default of issue, to the heirs males of the body of B. In our case, the limitations are to Esther Bouslaugh, during her natural life, and after her decease, to the heirs of her body, and to them and their heirs and assigns forever. The difference is, that there is a limitation over in the one case, and not in the other; the immateriality of which will be shown. But nothing is better established, by decision, than that superadded words of limitation, which import the same course of descent, are inoperative even in a will. The principle is sustained by Good *vs.* White, *Bl. R.* 1010; Henry *vs.* Purcell, *id.* 1002; Burnt *vs.* Coby, 1 *Barn. B. R.* 367; Goodright *vs.* Pullyn, 2 *L. Raym.* 1437; Wright *vs.* Pearson, 1 *Ed.* 119; Denn *vs.* Shenton, *Cowp.* 210; Measure *vs.* M'Gee, 5 *B. & A.* 910; and Rench *vs.* Ward, 2 *Sim. & Stu.* 411. In Goodright *vs.* Pullyn, the limitations were to the ancestor for life, and to the heirs males of his body, lawfully to be begotten, and his heirs, forever—words as strong as those in the deed under consideration, yet they were held to make an estate tail even in a will. In Carter *vs.* McMichael, 10 *S. & R.* 429, the same effect was given to a devise to a son, expressly for life; and to the heirs male of his

body at his death, and to the heirs and assigns of such heir male—exactly the superadded words here. So in Paxson *vs.* Lefferts, 3 *Rawle*, 59, where the devise was to a son during life, and if he should leave lawful issue, then to them and their heirs and assigns forever. In these cases, the rule in Shelly's case was enforced, though the superadded limitations in fee attempted to be engrafted on words of procreation, no more imported the same course of descent than do the superadded words in the limitation before us. But whatever might be their effect as proof of a misapplication of technical words in a will, where an intention to control their legal effect may be implied, they have no effect in a deed, for it admits not of implication. The only apparent exception to this, is found in Pybus *vs.* Mitford, 1 *Vent.* 372, where there was an implication of an intermediate use of the interest remaining in a grantor of a future use. Such an implication can arise, however, only on a deed of bargain and sale, or a covenant to stand seized.

No greater effect is attributable to the want of a limitation over, which evinces no more than an intent that the inheritance shall be in the particular tenant, if he shall have issue. But even where the question stands on a will, such a limitation has no other effect on the life estate than, in the absence of express words of procreation, to turn it into an estate tail. The operation of the rule in Shelly's case, is just this: It gives the ancestor an estate for life, in the first instance, and, by force of the devise to his heirs, general or special, the inheritance also, by conferring the remainder on him, as the stock from which alone they can inherit, and the source alone from which their inheritable blood can spring. Thus, a devise to one for life, with remainder to the heirs of his body, gives him an estate tail in possession by the merger of his life estate in the inheritance; but a devise to him for life, remainder to another for life, remainder to the heirs of the body of the first donee, gives him an estate for life in possession, and, by reason that the intermediate life estate prevents the merger, an estate tail in expectancy. This solution of what might else be a difficulty, is given by Mr. Hays, in a manner so simple and satisfactory as to leave no doubt of its accuracy. In the cases quoted, there was, not only an express limitation to heirs of the body, but an implication of the same limitation from a limitation over. But can the latter be more operative than the former? Where there is an express limitation to heirs of the body, there is no room for an implied one. That it is supposed to fill up the measure of the intention, and to leave nothing to be supplied by intendments, is sustained by Higham *vs.* Baker, *Cro. Eliz.* 16; Bamfield *vs.* Popham, *P. Wms.* 54; Blackburn *vs.* Edgely, *Id.* 600; Attorney General *vs.* Sutton, *Id.* 760, and Glover *vs.* Clarches, cited in Higham *vs.* Baker. In its essential properties, therefore, Shelly's case is the case before us; for could there be an implication from

[Hileman et al. *v.* Bouslaugh.]

a limitation over in a legal conveyance, the consequence would be the same.     Indeed, the limitation over does not seem to have been considered an element of that case.

The argument that the estate limited to the mother is equitable, and that the limitation to the heirs of her body is legal, is unfounded.     A wife may purchase without her husband's assent; and, although he may divest her estate by disagreeing to the purchase, the title is in her in the meantime.     In this instance the husband did not disagree, and she took the legal estate as if she was a *feme sole.*     Equitable limitations to married women are sometimes distinguished from legal limitations—certainly executory trusts are—but we have here an executed conveyance of a legal estate, which, as the husband did not disagree to it, vested the property in the wife subject to his power to divest it.

It is decisive against the alleged testamentary character of the instrument, that it is not absolutely a will.     It must be exclusively so, or it is a deed; for there is no middle ground; and no will, as this instrument did, ever passed the property in the donor's life time.     The Attorney General *vs.* Jones, 3 *Price*, 368, is more than apocryphal.     It was not only decided by a divided court, but one of the four judges declared, that had not the instrument contained a power of revocation, he would not have concurred.     They would then have stood two to two, and the case, as a precedent, would have been neutralized.     But it would be strange if every deed which contains such a power, should therefore be deemed a will. Mr. Jarman, the editor of Powell on Devises, and himself the author of a treatise on the subject, scarcely conceals his dissatisfaction at the decision.     It would expunge a rudimental distinction from the law of property.     Nor is the coonstruction of the deed to be nfluenced by any thing in the will that preceded it, which, being inoperative till the testator's death, would be no evidence of intermediate intention, even if it might bear on the result.     To show an actual intention contrary to the legal effect of the deed, would be to show nothing.     The deed itself shows it; but it is an intention forbidden by the law.

It is the opinion of the court, that Esther Bouslaugh took an estate tail general, which, at her death, descended to Jacob Bouslaugh, the plaintiff, who is consequently entitled to recover.

Judgment affirmed.

COULTER and BURNSIDE dissented.