## Shoemaker *against* Huffnagle.

Warrant granted in 1683 by the proprietary, at the request of Richard Wall, Sen., and partners, late purchasers of 1100 acres, to survey a lot in the back street of the city of Philadelphia. A will in 1697–8, signed Richard Wall, devising his estate, land, plantation, &c., in Cheltenham township, to his granddaughter in tail, without survey, patent, &c., of the 1100 acres, is no evidence that they are the same lands.

The warrant being to Richard Wall, Sen., and partners, and the will by Richard Wall, the tendency of the proof is, that the warrantee and the testator were different persons.

A warrant for a city lot granted in 1683, and remaining unlocated, is not capable of being entailed by devise in tail of a man's land and plantation.

Such lot cannot be considered appurtenant to country land, unless the owner of the country land were a first purchaser; nor can it be so considered, where, on the face of the warrant, it was granted on special request.

A devise of estate, land and plantation, to S. S., by her freely to be possessed and enjoyed, but in case she shall happen to die without children and heirs of her body, then over, creates an estate tail.

If tenant in tail institutes ejectment for land, and dies pending the suit, the child and next heir in tail is such "person next in interest" as may be substituted under the Act of 13th of April 1807.

THIS case came before this Court by certificate of error to the court of *Nisi Prius* of *Philadelphia* county, held before Judge KENNEDY, where a nonsuit was entered on motion.

It was an ejectment brought by Lewis Shoemaker against John Huffnagle and eighteen others, to recover a large lot of ground at the south-west corner of Mulberry and Ninth streets, in the city of Philadelphia, containing 80 feet in front on Mulberry street, and running back 307 feet to Filbert street. Before the trial, the death of Lewis Shoemaker was suggested, and Deborah E. Shoemaker, his only child, was substituted.

The plaintiff, Lewis Shoemaker, claimed by several descents as heir in tail of Sarah Shoemaker, who, as he alleged, derived title under the will of Richard Wall, grantee of William Penn, in 1683. He gave in evidence the following warrant:

William Penn, Proprietary and Governor of the Province of Pennsylvania, and the Territories thereunto belonging.

[SEAL.] At the request of Richard Wall, Sr., and Partners, late purchasers of 1100 Acres, yt. I would grant them to take up a lot in the City of Philadelphia.

These are to will and require thee forthwith to survey or cause to be surveyed unto them, a lot eighty foot Front in the back street, where not taken up, and make return thereof into my Secretary's office. Given at Philadelphia, the 2d 9br, 1683.                                             WM. PENN.

For Thomas Holmes, Surveyor Gen'l.

(*Endorsed.*) Richard Wall and others, War't. for a City Lott, 80 foot broad— a Bank Lott near the Sch'kill. Executed Aug. 17, 1781—307 ft. on 9th St., by 80 ft. Returned, &c., 21st Aug. 1781. See new file, No. 118. Wm. Brigdale, N. S.

IV. — 2 M *

[Shoemaker v. Huffnagle.]

The plaintiff next gave in evidence the will of Richard Wall, dated the 15th of the 1st month, A. D. 1697–8, and signed his "Richard ⨯ Wall," as follows: "As touching such worldly estate mark wherewith it hath pleased God to bless me in this wilderness, I dispose of the same in the following way and form: Imprimis, I doe give and bequeath unto Joan Wall, my beloved wife, all mine estate, land, house, household goods, and moveables, for the full terme of her life, kindly desiring George Shomaker to till and manure the said my land and plantation, and to give the just half of the crop or increase thereof to her, the said Joan Wall, and to keep and reserve the other half to himself. My three cows and one steer, she, the said my deare wife, and he, the said George Shomaker, are to part and divide equally between ym both. To William Bubb I give and bequeath one heifer of a year old. After the decease of Joan Wall, I herewith give to my well beloved granddaughter, Sara Shomaker, all and singular mine estate, land, plantation, household goods, and moveables, by her freely to be possessed and enjoyed. But in case she, the said my granddaughter Sarah, shall happen to dye without children, and heirs of her body, then my last will and testament is, that my land and plantation, with all improvemts. thereof, shall be left to the disposall of ye Monthly Meeting I now belong to, so that Friends of the said Meeting may do with the said land and plantation as they see meet. Item: I freely give and bequeath unto Friends of Cheltenham Meeting a certain tract of land, containing about six acres, lying and being at ye south-west end of the said my plantation, and this piece of land I give for a burying place, and for the only and sole use of Friends of the now mentioned Cheltenham Meeting; and I do herewith constitute, make and ordain the above said my granddaughter, Sarah Shomaker, my only execut'r., requiring that this, my last will and testament, may in all parts be accomplished and fulfilled."

The marriage of George Shoemaker and Sarah Wall on the 28th of the 11th month 1694, was then proved by a certificate; and that Abraham was their only son, and William was the son of Abraham, and Abraham was the eldest son of William, and Lewis the oldest surviving issue of Abraham, and was then dead, leaving one child, Deborah.

On the 17th of May 1781, William Shoemaker, of Cheltenham township, Philadelphia county, executed a deed to Abraham, his eldest son, reciting that the grantor was the eldest son and heir at law of Abraham Shoemaker, late deceased, who was the eldest son and heir at law of George Shoemaker, by Sarah his wife, also deceased, which said Sarah was the only daughter and heiress at law of Richard Wall, Jun., who was the eldest son and heir at law of Richard Wall, Sen., and both deceased, and reciting the war-

[Shoemaker v. Huffnagle.]

rant and conveying, in consideration of natural love and affection, and five shillings, all that the aforesaid lot of 80 feet front, surveyed or to be surveyed in the back streets of the city, in pursuance and in right of the said warrant, and all his estate, right and interest therein, and to the said recited warrant granted for surveying the same, to hold to the said Abraham Shoemaker, his heirs and assigns, to and for his and their own proper use and behoof for ever.

On the 27th of June 1781, Abraham Shoemaker and wife, by deed reciting the warrant and the foregoing deed, in consideration of £75, conveyed to James Parr and his heirs the lot aforesaid, surveyed or to be surveyed, &c., with special warranty.

On the 2d of July 1781, James Parr and William Grey applied to the Supreme Executive Council, setting forth " that Richard Wall, the elder, by virtue of the warrant of William Penn, dated the 2d of November 1683, directed to Thomas Holmes, then surveyor-general, became entitled to a lot in the city of Philadelphia of 80 feet front in the back streets; the same warrant remaining unexecuted, and no survey made thereupon. That the said Richard Wall died, leaving one only child, to wit: Richard Wall, the younger, who also died, leaving one only child, to wit: Sarah Wall, who married George Shoemaker, and afterwards died, leaving one only child, Abraham Shoemaker, who died, leaving one only child, William Shoemaker. That William Shoemaker, now living, conveyed his title to his son, Abraham Shoemaker, by deed of the 17th of May last; and the said Abraham, by deed, hath conveyed the same to your petitioners; all which they are able to prove to the satisfaction of your excellency and your honours, whensoever you shall be pleased to appoint. Wherefore your petitioners most humbly pray that their claim to a lot of 80 feet front, as aforesaid, may be heard and examined, and if found just by your honourable board, determined in their favour, so that they may be entitled to the relief prescribed in and by an Act of Assembly, made and passed the 10th day of April last, entitled ' an Act for the better support of the public credit by the immediate sale of the lands,' " &c.

On the 16th of August 1781, they presented another petition, stating that your memorialists, by their petition of the 2d of July last past, to your excellency and your honours, did set forth their title, as it then appeared to them, to a lot in the city of Philadelphia, of 80 feet front on the back streets. That upon further inquiry, and a more full investigation thereof, the same now appears to be deduced in the following manner. That Richard Wall, Sen., being entitled, as in and by the said petition is set forth, on or about the 15th of the first month 1697–8, did make his will, in writing, duly executed, and therein devised all his lands (excepting 6 acres in Cheltenham,) to his granddaughter, Sarah Shoemaker, in tail, and soon after died. That the same descended,

[Shoemaker v. Huffnagle.]

upon the death of the said Sarah, to her eldest son and heir at law, Abraham Shoemaker, and upon his death, to his eldest son and heir at law, William Shoemaker, now living, who conveyed the same lot to his eldest son, Abraham Shoemaker, as in and by the said petition is set forth, and the said Abraham Shoemaker hath conveyed the same lot to the said Major James Parr, by his deed of the 27th of July past, and the said Major Parr articuled, bargained and sold the one-half thereof to your memorialist, William Gray. That by means of the said conveyances, your memorialists are advised that they are entitled to the same at least for the lives of the said William and Abraham Shoemaker, and must depend upon recoveries, to be suffered hereafter, for the perfecting their titles; but in the mean time, as they are entitled at present, they most humbly pray that the relief prescribed in and by the Act of Assembly recited in their petition may be extended to them according to the prayer thereof.

On the 16th of August 1781, the following resolution was passed by the Supreme Executive Council:

"The petition of James Parr and William Gray, claiming a city lot in right of a warrant granted to Richard Wall, Sen., having been sundry times considered, and the title examined, and the surveyor-general having certified that upon an accurate search in his office he cannot find the said warrant, hath been satisfied, *resolved*, that the surveyor-general do proceed to locate a city lot agreeably to the terms of the warrant and the usual forms of office."

In pursuance of this order, the lot in question was surveyed and returned into office 21st of August 1781, with a plot. In 1785 it was re-surveyed on the application of subsequent purchasers under Parr and others, and divided off in proportion to the several owners, and patents issued to them in the usual forms.

The following opinion was delivered, on ordering the nonsuit, by KENNEDY, J.:

"The plaintiff claims, as the commencement of her title to the property in question, under a warrant, dated the 2d of November 1683, from William Penn, directing Thomas Holmes, his then surveyor-general, to survey a lot of ground in the city of Philadelphia, on the back street, wherever not taken up, for Richard Wall, Sen., and partners, late purchasers of 1100 acres of land. Now before the plaintiff can recover, it is certainly necessary that she should give evidence connecting her claim with this warrant of survey, as she makes it the very foundation of her alleged right. In order to show the commencement of such connexion, the last will and testament of a certain Richard Wall has been read in evidence. But, although this testator would seem, by his will, to have claimed land situate within a place called Cheltenham, and has undertaken to devise and dispose of it, yet it does not appear from the will, nor has it been shown otherwise, to be the 1100 acres, or

any part thereof, referred to in the warrant. Had the plaintiff produced and given in evidence an official copy of the survey of the 1100 acres, together with the warrant under which it was made, or the patent, if one were granted, it would have appeared therefrom whether the 1100 acres lay within Cheltenham or not, or at all events, where they lay; and if it had been shown by any other evidence that their location was within Cheltenham, it might perhaps have afforded us some advance towards showing a connexion between the testator and the 1100 acres. But the non-production of this evidence would rather seem to raise the presumption that the 1100 acres did not lie in Cheltenham, which, if true, would make strongly against the plaintiff's claim. But further, the will has no special reference to the property in question, and cannot be said from its face, or any other evidence given to embrace it.

It must also be further observed, that the description of Richard Wall, as given in the warrant and the will, does not accord altogether. For in the warrant Richard Wall is described as Richard Wall, *senior*, an addition to his name, which it is reasonable to presume, he assumed himself and used, whereas Richard Wall, the testator, is described in his will without the addition of 'senior,' and thus his name is set to the will. It is said, on behalf of the plaintiff, that senior was assumed, because at the date of the warrant he had a son called Richard, who was dead at the date of the will, and therefore it was dropped in the will. But of this there is no evidence, excepting recitals in deeds and petitions made and drawn about 1781, which are contradictory, and of too recent a date to be relied on as evidence. But further, Richard Wall, Sen. in the warrant was not the sole owner of the 1100 acres. He owned the same jointly with others, whereas the testator would seem to have been the sole owner of the land mentioned and disposed of by him in his will. Thus the evidence given by plaintiff on this point, instead of going to prove that Richard Wall named in the warrant, and Richard Wall, the testator, were the same person, tends pretty strongly to prove that they were two distinct and different persons. Indeed, it is difficult, if not impossible to come to the conclusion that Richard Wall, the warrantee, was the testator, without supposing that he had disposed of all his interest in the 1100 acres, and purchased other land in severalty, or had become the several owner of the 1100 acres, by purchase thereof from his partners, or acquired a portion thereof in severalty, by a partition made between him and them, only one of which several suppositions would be consistent with the plaintiff's claim, while the others would be inconsistent with and adverse to it, if it be as the counsel for the plaintiff allege, that the property in question, or at least the warrant under which it has been secured, may be regarded as appurtenant to the grant of the 1100 acres. In short, from the state of the

IV. — 56

[Shoemaker v. Huffnagle.]

evidence it is even impossible to form a conjecture in regard to what became of the 1100 acres, how they were disposed of, or who Richard Wall, Sen. and his partners were, and who continued to be the owner or owners of the same.

But one thing appears pretty certain, that a right, under the warrant, to the city lot, was never reduced to certainty by the warrantees, or any of them; no location or election was ever made by having a survey made in pursuance of the warrant, which leads to the consideration of a second point made by the defendants; which is, supposing Richard Wall, the testator, to have been Richard Wall, Sen. the warrantee, yet he had not at the time of making his will, which was on the 15th of January 1697–8, nor indeed at any time during his life, such a right, interest or estate, either in or under the warrant. as could be disposed of in tail by him in his will.   Mr Justice Sergeant, in his treatise on the land law of this State, which I consider a most valuable and accurate work, speaking, in page 150, of the mode of obtaining vacant lands from proprietaries by warrant, application and survey, settlement or otherwise, says, ' in more ancient times these claims to land were ranked as chattels, and sold as such by parol and delivery. They passed *by will, in absolute property, without words of inheritance.* They were transferred by executors, and sold by administrators without any order of the Orphans' Court.   Ejectment could not be supported on them.'   The authorities referred to by him in the margin of the work, sustain the law as laid down by him fully; and he shows further, that such was considered and held to be the law until about the year 1758, when they began to be treated as titles to real estate, on which ejectment might be sustained, and of which conveyances were within the recording acts.   That thence they became subject to all the rules of descent, *devise* and transfer, which govern the ordinary titles to real estate, capable of being entailed, liable as real estate to dower, curtesy, lien and execution.   Here it will be observed that even lands held under warrants and *surveys*, without more, were treated and regarded in law as chattels until about 1758; but down to the present time an indescriptive warrant for land within the State, without being located by a survey, is not considered real estate, or anything more at most than a thing in action.   *Heath* v. *Knapp*, (10 *Watts* 405).   It does not appear that Richard Wall, Sen., and his partners, were among the number of first purchasers from William Penn, in regard to the 1100 acres; on the contrary, it is pretty evident that they were not, and hence there is no ground for saying that the lot in question was an incident to the purchase of the 1100 acres.   Indeed, the warrant in its terms seems to negative the idea of its being incident, for it is said to be granted at the *special request* of the warrantees; which would and ought not to have been said, had they been entitled to it on the ground of their having been first purchasers.   This case, therefore, cannot be likened

[Shoemaker v. Huffnagle.]

to *The Lessee of Hill* v. *West,* (4 *Yeates* 142), which has been cited by the plaintiff's counsel. There the lot had been surveyed and set apart as the property of the original, that is, *first* purchasers, of 5000 acres, to which it was considered incident, so that a right to the specific lot which had been surveyed thereby became vested in them; and the only question raised in the case was, whether in a conveyance made by the first purchasers of the 5000 acres, with the *appurtenances,* the word 'appurtenances' was not sufficient, in the absence of any intention to the contrary, to pass the lot with the 5000; and a majority of the court held that it was, which, as it seems to me, was going pretty far. But in this case no survey having been made on the lot in pursuance of the warrant, nor indeed on any other lot, at the time of making the will, nor until upwards of 80 years after the death of the testator, and the warrant not calling for it, but for a lot in the back street, not previously taken, which, no doubt, at the time suited a thousand other lots equally well, it is clear that no right whatever was ever vested in the testator to the lot in question. Seeing, then, that the testator had no right or interest to, or in the lot in question, at the time of making his will, or at any time afterwards, I cannot conceive how it can be considered as any part of his 'land and plantation,' which is the only thing that can be said to be devised in tail by him in his will. This view of the question, if correct, and I think it is, goes to show that the plaintiff has no right to recover in this action.

It was also made a question, but I think not much relied on, whether any portion of the testator's estate can be considered as having been devised in tail by him. I, however, have no doubt 'his land and plantation,' which is given to Sarah Shoemaker, by the will, first, though in terms sufficient to create and pass a fee-simple therein to her, must be deemed only an estate-tail, on account of the subsequent qualification, whereby the testator, in case of Sarah Shoemaker's dying without children and heirs of her body, directs that his land and plantation shall go over to, &c. &c.

A fourth point was made by the defendants; that the present plaintiff claiming the lot in question, as tenant in tail, under the same entailment, by, for or virtue of which her father claimed, and instituted this action for the recovery of it, cannot be considered, upon the death of her father pending the action, as being the 'person next in interest,' and entitled, under the 3d section of the Act of Assembly of the 13th of April 1807, (*Purd.* 334), to be substituted in the place of the plaintiff deceased. If she claimed the fee-simple in the lot, as heir to her father, who brought the action, it seems to be admitted that she might be considered the person next in interest, and entitled to be substituted as plaintiff in his place. And under the Act of Assembly it is perfectly clear that she would. This being the law, I am not, at present, able to perceive any sufficient reason for admitting her to be substituted

[Shoemaker v. Huffnagle.]

in the one case, but not in the other.   In either case, the right of the party claiming to be substituted is by descent, and not by purchase.   In the former case, the party claims to be substituted, under the Act, on the ground that he is related to the plaintiff, who instituted the action, and that the right of such plaintiff to the property, which is the object of the suit, has descended by operation of law upon him; so in the latter case, the party claims to be substituted on the ground that he is not only related to the plaintiff, who instituted the suit, but that he is his next lineal descendant, upon whom the right of the plaintiff has descended, as heir, according to the form of the gift made to the original donee in tail.   And if there be any difference between the two cases, the expression ' next in interest,' so far as it depends on the relationship, would seem to be more applicable to the heir in tail than to the heir in fee-simple.   I am inclined to think that Deborah Elizabeth Shoemaker was entitled to be substituted, and if she could have made out her case, she would have had the same right to recover that Lewis Shoemaker, her father, who brought the action, would.   But as she has failed to make out her case in the particulars stated above, so as to enable her to maintain the action, I therefore order and direct a judgment of nonsuit to be entered; and the jury are discharged from giving a verdict."

The plaintiff excepted to this opinion and order of the court, and assigned for error that the learned judge erred in directing a judgment of nonsuit to be entered, and in discharging the jury from giving any verdict in the cause.

*G. M. Wharton*, for the plaintiff in error, (with whom was *Mallery*).   There was evidence sufficient in the wills, and recitals in the deeds and petitions, and the marriage certificates, to leave it to the jury to determine whether Richard Wall, Sen., the warrantee, and Richard Wall, the testator, were not the same.   Identity is a question of fact, and the presumption is that the parties were the same, where the name is the same, and there is no ground of suspicion created.   In *Murphy* v. *Loyd*, (3 *Whart*. 538), which is the only case that seems against us, there was not a spark of evidence.   It often happens that third persons call one senior, and not himself.   The will shows he had but one child, and that a son, because the daughter is named Wall.   The deeds of 1781, and subsequent documents recite that this son was Richard Wall, Jun., and such recitals are evidence of pedigree, considering those made by Parr and Gray as of their own knowledge, and the acts of the Supreme Executive Council upon them.

The only requisite to an entail is that it be of land or of something arising out of land, and that the estate be an estate of inheritance.   Money agreed to be laid out in land may be entailed, so may one of the offices of the Court of Common Pleas. 1 *Cruise's Dig. " Estate Tail"* 89, 90.   No authority is produced to show,

[Shoemaker v. Huffnagle.]

that however it may have been as to country land, a warrant for a city lot in a back street, is not susceptible of entailment, and they stand on a different footing. The right to city lots passed as appurtenant to country land, and that before location and survey. *Hill* v. *West*, (4 *Yeates* 142). And the Supreme Executive Council treated it as real, not personal. Besides the first purchasers in England, there were first purchasers here, all of whom got city lots as appurtenant. Richard Wall may have owned 1100 acres besides the plantation mentioned in the will. In *Heath* v. *Knapp*, (10 *Watts* 405), the devisees of Robert Morris of an unlocated warrant, recovered the real estate. They also referred to the *Act of 27th November* 1779, (1 *Smith's Laws* 481, 531), and *Act of 10th April* 1781; 10 *Wheat.* 565; 1 *Wils.* 276; 3 *Binn.* 4; 2 *Yeates* 94.

*T. I. Wharton* and *J. Sergeant, contra,* were stopped by the court.

PER CURIAM.—The court being satisfied with the opinion of the judge before whom the cause was tried, as also the reasoning contained in it, do therefore approve and adopt it. The judgment is accordingly affirmed.

Judgment affirmed.