# Yarnall's Appeal.

1. Mrs. Ellis gave the residue of her estate to Yarnall in trust for the use of all her children living at her death and the issue of such as might be then dead in equal parts, &c., the income of the shares of her sons to be applied to their use during minority, and paid to them as they arrived at age. The trustee to hold the shares of the daughters and pay the income during their lives, free from the debts, &c., "of any husband they may have or take," after their death to pay the daughters' shares according to their wills; in default of a will the trustee to grant, pay, &c., the daughters' shares to "such person or persons as would be entitled to the same in case they had survived their respective husbands and departed this life intestate seised thereof in fee." The daughters having attained full age and being unmarried: Held, that they took an absolute estate in fee.

2. The trust for their separate use fell, there being no coverture when the will took effect and none in contemplation.

3. Form of words importing an active trust does not sustain it, if its purpose should fail.

4. Where the testator intends the estate to go to the whole body of persons constituting in law the entire descent lineal, he means "issue" or "heirs of the body."

5. If the testator intends the estate to go to the whole line of descent lineal and collateral, he means "heirs."

6. Technical phrases in wills, as well as forms of expression in other cases, will not overturn the intent clearly ascertained to be different in a will under examination.

7. The rule in Shelley's Case is not a real exception to the rule that the intention of the testator must guide in interpreting a will; it sacrifices a particular to a general intent.

8. The rule in Shelley's Case does not interpret a will; it takes effect when the interpretation has been ascertained.

9. "Heirs," "heirs of the body," "Issue," "children," "sons," and similar expressions are words of limitation or purchase according to the intent of the testator in each particular will.

10. When an estate for life is given with a general power of appointment and on failure to appoint, to children or special heirs, the power will not enlarge the estate to a fee or fee tail, and the children or special heirs will take by purchase.

11. A power to appoint will not cut down an estate of inheritance.

12. When a remainder, on failure to appoint, is devised to the heirs of the life-tenant, the inheritance will pass to the life-tenant.

| | |
|---|---|
| 70 | 335 |
| 135 | 117 |
| 70 | 335 |
| 136 | 151 |
| 70 | 335 |
| 141 | 359 |
| 70 | 335 |
| 144 | 453 |
| 70 | 335 |
| 155 | 636 |
| 70 | 335 |
| 169 | 86 |
| 70 | 335 |
| 174 | 514 |
| 70 | 335 |
| 193 | 54 |
| 70 | 335 |
| 197 | 458 |
| 197 | 618 |
| 70 | 335 |
| 199 | 492 |
| 70 | 335 |
| 203 | ¹568 |
| 70 | 335 |
| 207 | ¹613 |
| 70 | 335 |
| 205 | ⁰55 |
| 205 | ⁰618 |
| 70 | 335 |
| 222 | 38 |
| 37SC | 174 |

[Yarnall's Appeal.]

January 9th 1872.    Before THOMPSON, C. J., AGNEW and
SHARSWOOD, JJ.    WILLIAMS, J., at Nisi Prius.

Appeal from the decree of the Orphans' Court of *Philadelphia*:
Of January Term 1871, No. 91.·

The question in this case was the proper construction of the
will of Hannah Ellis, deceased.

Sarah Byrnes, by a codicil, dated January 17th 1855, to her
will, made the following provision :—

"And it· is my will ·that ʳafter the decease of my grand-
daughter Hannah A. Ellis, the estate given, devised and be-
queathed in my said will in trust for her use during her natural
life with remainder over shall, after the decease of the said Han-
nah A. Ellis, vest absolutely in such person or persons, and for
such estates as my said granddaughter, by her last will and testa-
ment, or any instrument in the nature thereof, notwithstanding
any coverture, may direct, limit and appoint.    And for want of
any such will or instrument in the nature thereof, then I do give,
devise and bequeath the said estate to such person or persons
(and for such estates and in such shares and proportions) as would
be entitled to the same under the intestate laws of Pennsylvania, .
in case my said granddaughter should depart this life intestate,
seised of the same absolutely and in fee simple."

Hannah Ellis, by her will dated July 21st 1855, recited the
foregoing clause of the will of Mrs. Byrnes, and proceeded:

"Now be it remembered that I, the said Hannah A. Ellis, &c.,
by virtue of the power and authority given and granted unto me,
in and by the above-recited codicil, and of all *other* powers and
authorities me in anywise enabling, do make my last will and
testament in manner following, that is to say, 1st, I give and
bequeath the sum of thirty thousand dollars of the estate so given,
devised and bequeathed by the said Sarah Byrnes as aforesaid,
unto my beloved husband, William Ellis, for his own absolute use
and benefit.    *Item:* All the rest, residue and remainder of the
said estate, and all other estate, real and personal, whatsoever and
wheresoever I may die seised, possessed or entitled to, I give,
devise and bequeath unto my friend Ellis Yarnall, of the city of
Philadelphia, in trust for the only proper benefit, use and behoof
of all my children that may be living at the time of my decease,
and the lawful issue of such of them as may then be deceased, in
equal parts and shares as hereinafter directed and set forth ; such
issue taking and receiving, however, such part and share only as
his, her or their deceased parents would have taken and received
if then living.    I direct that the interest and income of the share
or shares of any son or sons I may leave me surviving, be applied
by the said trustee to his or their proper use and benefit during
his or their· minority, and the said share or shares be paid to my
said son or sons, as he or they shall severally attain the‿age of

[Yarnall's Appeal.]

twenty-one years. And the parts and shares of my daughters, who may then be living at the time of my decease, I direct said trustee to hold in trust to pay the interest and income thereof to my said daughters during their respective natural lives, free from the debts, control or engagements of any husband they may have or take; and after the decease of my said daughters I direct my said trustee to grant, assign and pay the said shares of my said daughters, of and in my said estate, to such person or persons, in such proportions and for such estates and interests as my said daughters, by any instrument of writing in the nature of a last will and testament, may respectively direct, limit and appoint. And for want of such direction, limitation or appointment, then I direct the said trustee to grant, assign and pay the same to such person or persons as would be entitled to the same, in case they, my said daughters, had survived their respective husbands and departed this life intestate seised thereof in fee."

Mrs. Ellis died in December 1857, leaving two daughters, Sarah B. Ellis and Frances L. Ellis, and a son, William L. Ellis; the daughters being at that time of the ages of thirteen and eleven years respectively.

In 1869, Yarnall, the trustee, having settled his account, the two daughters, who had then arrived at age and were unmarried, petitioned the Orphans' Court to decree that the trustee " do transfer, convey, deliver and pay over to your petitioners their respective shares of the said estate, both principal and rents, interest, income and profits as aforesaid due and collected thereon, as their absolute property."

The trustee answered, alleging amongst other things, " that the trust under the will of the said Hannah A. Ellis is, as he is advised, an active trust, requiring a trustee in order to carry out the provisions of her said will, and that the corpus or principal of the estate cannot be paid to the petitioners."

The matter was referred to William L. Dennis, Esq., as auditor, who in an elaborate and well considered report, decided: " that there remains no active trust under the will, and that the petitioners are entitled to the legal estate,—that is, to two-thirds of the trust estate; and a conveyance of this estate should be made to them by the trustee."

The Orphans' Court confirmed the report of the auditor, and ordered the trustee to deliver, &c., to the petitioners their shares of the estate, &c.

Ellis Yarnall appealed to the Supreme Court from the decree of the Orphans' Court, and assigned the decree for error.

*E. Hopper*, for appellant.—The intention of the testatrix is expressed to give her sons an absolute estate; to her daughters the bequest is for their " *natural lives ;*" the intention therefore

20 P. F. SMITH—22

[Yarnall's Appeal.]

is to give them a different estate, which could be but for life. He cited Dodson *v.* Ball, 10 P. F. Smith 492; Ralston *v.* Waln, 8 Wright 279.

*W. W. Wiltbank,* for appellee.—The legatees not being covert nor in contemplation of marriage, the bequest is invalid as a separate estate: Wells *v.* McCall, 14 P. F. Smith 207; Koenig's Appeal, 7 Id. 352; Freyvogle *v.* Hughes, 6 Id. 228; Nice's Appeal, 14 Wright 143; McBride *v.* Smyth, 4 P. F. Smith 245; Dodson *v.* Ball, 10 Id. 492; Steacy *v.* Rice, 3 Casey 75; Megargee *v.* Naglee, 14 P. F. Smith 216. The part of the clause which provides for a conveyance by the trustee after death of the daughters must be disregarded, inasmuch as it does not create an active trust: Bacon's Appeal, 7 P. F. Smith 504; Rife *v.* Geyer, 9 Id. 393; Dodson *v.* Ball, 10 Id. 492; Nice's Appeal, 14 Wright 143. A gift to heirs according to the intestate laws contemplates a gift to all heirs known to the law: Physick's Appeal, 14 Wright 128.

The opinion of the court was delivered, May 13th 1872, by

AGNEW, J.—The estate in question came to Mrs. Hannah A. Ellis under the will of Mrs. Sarah Byrnes, her grandmother. Mrs. Byrnes devised and bequeathed it to Mrs. Ellis for life, with a power of appointment by will; and on failure to appoint with remainder to the same persons who would take it under the intestate law, if Mrs. Ellis had the absolute estate. Mrs. Ellis by her will devised and bequeathed the estate thus devised to Ellis Yarnall in trust for all her children living at her decease, and the issue of those then dead, the issue taking the shares their deceased parents would have taken if living. As to the parts and shares of her daughters living at her death, Mrs. Ellis directed the trustee to hold the same *in trust to pay the interest and income thereof* to her said daughters *during their natural lives, free from the debts, contracts and engagements of any husband* they might have or take. This was followed by a power of appointment by will given to the daughters. The will then proceeds: "And for want of such direction, limitation or appointment, then I direct said trustee to grant, assign and pay the same to such person or persons as would be entitled to the same in case they, my said daughters, *had survived their respective husbands,* and departed this life intestate, seised thereof in fee."

In the court below the auditor held that the trust for the separate use fell, the daughters being only eleven and thirteen years of age in 1857 when Mrs. Ellis died, and being still unmarried in 1869, when they presented their petition in this case. He held also that the daughters took a fee under the will. The report was confirmed by the court. So far as regards the *separate use,* the

conclusion that the trust fell is amply sustained by authority, there being no coverture when the will took effect, and no marriage in immediate contemplation: Dodson v. Ball, 10 P. F. Smith 496–7; Freyvogle v. Hughes, 6 Id. 228; Koenig's Appeal, 7 Id. 352; Rife v. Geyer, 9 Id. 393; Megargee v. Naglee, 14 Id. 216.

But whether the trust fell altogether depends upon other considerations—whether there were other grounds to sustain it. It is clear that as to the daughters the *corpus* of the estate vested in the trustee, and he was to *pay over the interest and income* to the daughters of Mrs. Ellis *during life*. If, therefore, the daughters took a life estate and no more, and the trust was required to protect the remainders, the language of the trust to pay over the interest and income only would import an active trust, and it would not fall. But if the daughters took estates in fee in the realty, or absolute in the personalty, the trust would be active only during the existence of the separate estates provided for in the will, and when they fell the trust would fall also, there being no beneficial purpose to sustain it. The mere form of words importing an active trust does not sustain the trust if the purpose of its creation should fail: Koenig's Appeal, *supra;* Rife v. Geyer, *supra;* Megargee v. Naglee, *supra;* Ogden and wife v. Evans, decided at this term. (*Postea*, p. 501.)

The real question upon this will is, whether the language of the remainder over on a failure to appoint imports the same thing, according to the true and actual intent of the testatrix as a devise to the *heirs* of the daughters. If so, the life estate and remainder would coalesce, by reason of that intent, and the daughters would take absolute estates. It cannot be doubted that the testatrix had in her mind the whole line of descent according to law, when she directed the estate to go to such person or persons as would be entitled to the same in case her said daughters had survived their respective husbands and departed this life intestate seised thereof in fee. The daughters were then not married, and had neither husband nor children, and yet the testatrix evidently contemplated their marriage. Who would be the person or persons to take the inheritance was entirely unknown, and would not be known till the death of the daughters, yet as he or they were to take as if the daughters died seised in fee and intestate, none but the heirs at law could be intended, and none being specially designated, the whole would be necessarily included: See Dodson v. Ball, 10 P. F. Smith 497, and cases therein cited. The principle of these cases is one of interpretation only, not a rule of law, for those instruments which do not fall within the strict rule of law requiring the use of the word "heirs" to create an estate of inheritance. In wills and mere trusts the intention to vest the estate in the heirs at law of the life tenant may be inferred from other terms: Fearne on Remainders 145*; Haldeman v. Halde-

man, 4 Wright 29; McBride *v.* Smyth, 4 P. F. Smith 245; Frey-vogle *v.* Hughes, 6 Id. 228; Dodson *v.* Ball, *supra.* Where a testator intends the estate to go to the whole body of persons in legal succession constituting *in law* the entire line of descent lineal, he evidently means the same thing as if he had said "issue" or "heirs of the body;" or if he intends it to go to the whole line of descent, lineal and collateral, he means the same thing as if he had used the term "heirs," which as a word of art describes precisely the same line of descent.

In regard to wills the cases show that technical phrases, as well as forms of expression decided in other cases, are not permitted to overturn the intent of the testator, when that intent is clearly ascertained to be different in the will under examination by the court. This broad principle needs no citation to support it, for it is founded on the universal rule, that the intention of the testator is the guide for the interpretation of wills. The rule in Shelley's Case is only an apparent not a real exception to this statement. It sacrifices a particular intent only to give effect to the main intent of the testator. All the authorities agree that this rule has no place in the interpretation of a will, and takes effect only when the interpretation has been first ascertained. Mr. Fearne, in his work on Contingent Remainders, p. *188, says, "Nothing can be better founded than Mr. Hargraves' doctrine, that the rule in Shelley's Case is no medium for finding out the intention of the testator; that on the contrary, the rule supposes the intention already discovered, and to be a superadded succession to the heirs, general or special, of the donee for life, by making such donee the ancestor *terminus* or stirps, from which the whole generation or posterity of heirs is to be accounted; and that whether the conveyance has or has not so constituted an estate of freehold, with a succession engrafted on it, is a previous question, which ought to be adjusted before the rule is thought of; that to resolve that point, the ordinary rules from interpreting the language of wills ought to be resorted to; that when it is once settled, that the donor or testator has used words of inheritance according to their legal import, has applied them intentionally to comprise the whole line of heirs, of the tenant for life, and has really made him the *terminus* or ancestor, by reference to whom the succession is to be regulated, then comes the proper time to inspect the rule in Shelley's Case." In Hileman *v.* Bouslaugh, 1 Harris 351–2, C. J. Gibson expresses the same thought in fewer words. He says, "the rule operates only on the intention of the testator when it has been ascertained, not on the meaning of the words used to express it. The ascertainment is left to the ordinary rules of construction peculiar to wills, but when this is ascertained—is found to be within the rule—then there is but one way: it admits of no exceptions."

[Yarnall's Appeal.]

I cite these expressions, not for the purpose of applying the rule in Shelley's Case, strictly so called, to this case; but to show that the intent of the testator, as discovered from his will, is the true and only guide to its interpretation before the law will declare its effect, and as explanatory of the contrariety of decision upon different wills in the use of the words "heirs," "heirs of the body," "issue," "children," "sons," and similar expressions. Each has been held to be a word of limitation, or a word of purchase, as the intent of the testator in the particular will has been found to warrant it. Many of these contrarieties will be found in the cases noticed in the opinions in Coursey v. Davis, 10 Wright 25, and Powell v. Domestic Missions Board, 13 Wright 46. See also Smith on Ex. Int., chapter 13; Cote v. Von Bonnhorst, 5 Wright 243.

As most pertinent to the present will, I may refer to those cases in which the word "child or children" has been held to be a word of limitation creating an estate tail in the life-tenant by analogy to the rule Shelley's Case: Wild's Case, 6 Coke 17; Davie v. Stephens, Doug. 321 (306); Hodges v. Middleton, Id. 431 (415); Seall v. Baxter, 2 Bos. & Pull. 485; Wood v. Baron, 1 East 259; Shoemaker v. Huffnagle, 4 W. & S. 437; Potts's Appeal, 6 Casey 168; Cote v. Von Bonnhorst, supra; McKee v. McKinley, 9 Casey 92. Perhaps the strongest case in this state, as a test of the rule of interpretation of the word "child," or "children," is Haldeman v. Haldeman, 4 Wright 29. It is important also, as the opinion came from the same judge who wrote Guthrie's Appeal, 1 Wright 9, the converse of Haldeman v. Haldeman, and therefore displays the rule of interpretation of wills by actual intent in a strong light. The devise to the daughters there, was: "To each of them during their *natural lives* the *income or profit* arising out of each of their shares of the residue, and after the death of either of them, to descend and go to the *child*, and if *children, share and share alike*. Should either of my daughters, Sarah, Mary, or Susan die, and *leave* no lawful *issue*, then such share or portion is to fall back again to the residue, and form part of the same." Remarking on this devise, Judge Strong said: "Now, if the will be examined, it seems quite plain that the testator employed the words 'child,' 'children' and 'issue' indiscriminately, and all of them as meaning an *entire line* of lineal descent." Again, referring to the general rule making such expressions words of purchase, he says: "It is never applied when the word 'children' is evidently intended to define an *entire line of succession*." His conclusion was, that Susan took a fee tail, enlarged by the Act of 1855 into a fee simple.

With these decisions before us, the rule laid down by Judge Oswald Thompson, in Potts's Appeal, 6 Casey 170, and adopted by this court, seems fairly to have its foundation both in reason and

authority, viz. : That "*any form of words* sufficient to show that the remainder is to go to those whom *the law* points out as the *general* or *lineal heirs* of the first taker will *enlarge* the estate for *life* of the first taker to an estate *tail* by implication." The same rule in substance was stated in Price *v.* Taylor, 4 Casey 95, in these words : " If, therefore, the remainder is to persons standing in the relation of general or special heirs of the tenant for life, the law presumes that they take as heirs, unless it unequivocally appears that individuals other than persons who are to take simply as heirs are intended." This rule was adopted in Dodson *v.* Ball, 10 P. F. Smith 493, and the cases illustrating it were cited and commented on. As some of these cases have been doubted or overruled in relation to the application of the rule to the terms of the instrument in which the gift or devise was made, as well as some in other respects (for instance Price *v.* Taylor), care was taken in Dodson *v.* Ball to restrict their authority simply to the statement of the rule itself. That rule was stated thus : " That whenever the terms of the limitation can be fairly and justly interpreted to mean ' heirs ' or ' heirs of the body,' an estate of inheritance will be presumed to have been intended by the testator." To these may be added as illustrative, Maurer *v.* Marshall, 4 Harris 377 ; Vaughan *v.* Dickens, 8 Harris 509 ; Braden *v.* Cannon, 12 Harris 168 ; Rancel *v.* Creswell, 6 Casey 158.

There is another rule of interpretation perhaps equally well settled, that when an estate for life only is given, followed by a general power of appointment, and on failure to appoint to children or to special heirs, the power to appoint will not enlarge the estate of the life-tenant to a fee or fee tail, and the children or special heirs, as they are termed, take by purchase and not by descent. The authorities for this rule will be found in Dodson *v.* Ball, 10 P. F. Smith 497. But though the power to appoint does not enlarge the life estate, it will clearly not cut down an estate of inheritance intended by the testator, as drawn from his entire will. Hence, when the testator devises the remainder on a failure to appoint, to the heirs of the life-tenant, or by words which mean the same thing, the inheritance will pass to the life-tenant. This is the necessary result of the rule to be guided by the actual intent of the testator. Now if the body of persons thus described constitute in fact the heirs of the life-tenant, and represent only a line of descent, and not specially designated persons, the devisee for life becomes the stock or source of the descent, and by analogy to the rule in Shelley's Case, or perhaps it is better to say, from necessity, he takes the inheritance. The remainder being limited to his heirs, he necessarily becomes the *stirps* or root of a line of unknown persons, not individuated by the will, yet dependent on him as their source. They spring into recognition only at his death, for *nemo est hœres viventis.* In other words, they come at

the bidding of the law, and not of the testator, who merely adopts them as the law turns them up in the furrow of descent. He who might have appeared to be the heir at the date of the will, by marriage, birth or death, may not be heir when the will takes effect. In the very logic of the succession, the life estate, therefore, incorporates with the inheritance, because of the failure of the testator to designate any other than the legal line of descent. In short, he *calls* the devisee a tenant for life, yet vests the fee in him. This being the intent of the testator, it is immaterial in the will, whether he describes the line of descent by a word of art, or by a periphrasis, meaning the same thing. I have used the expression, " by analogy to the rule in Shelley's Case," to avoid misapprehension. As stated by Mr. Smith, Ex. Int., chap. 13, sect. 1, the rule strictly is confined to those cases where the instrument uses the word " heirs," or " heirs of the body." But he admits of what he calls a " translation of that rule into terms of a different and more extensive character, embracing cases where the words ' issue,' ' children,' ' sons' and ' daughters,' have been used instead of the word heirs,' " § 397.

It is argued in this case that the exclusion of the husbands of the daughters in the remainder clause, narrows the line of descent. But clearly this does not change the intent of the testatrix in this will, for it must be remembered that there were no husbands in existence, and that this so-called exclusion is an expression corresponding with the intent of the testatrix, which was to give the daughters separate estates, the effect of which would be to exclude the husbands : Cochran *v.* O'Hern, 4 W. & S. 95 ; Stokes *v.* McKibben, 1 Harris 267 ; Rigler *v.* Cloud, 2 Harris 361. The exclusion of the husbands in the terms of the remainder is therefore consistent with the intent of the testatrix to give the estate to the heirs at law of the daughters, as persons taking the estate in their own right and free from the interposition of the husbands, when the daughters should marry. The failing of the trust for coverture, which the testatrix supposed she was creating, will not frustrate the general intent ; but, on the contrary, it left the particular estates in the daughters' legal estates, and enabled them, even if the rule in Shelley's Case were strictly applicable, to coalesce with the remainders. The view we have thus taken of the true intent of the testatrix, leads to the affirmation of the decree of the court below.

The decree is accordingly affirmed with costs.