## Thorne's Estate.

Argued March 27, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Charles J. Margiotti,* of *Margiotti & Pugliese,* with him *Spencer W. Hill,* for appellants.

*Arthur H. Hull,* of *Snyder, Hull, Leiby & Metzger,* with him *John G. Candor, Geo. Ross Hull* and *John C. Youngman,* for appellee.

OPINION BY MR. JUSTICE MAXEY, April 20, 1942:

This is an appeal from the decree of the court below dismissing the petitions of appellants for a citation directed to the Lycoming Trust Company and others to show cause why the decrees of confirmation of the first and partial account and also the second and final account, insofar as the rights of the petitioners are concerned, should not be vacated, set aside, opened, reviewed and corrected, and why such order of restitution as may be meet should not be decreed to them.

The petitioners below and appellants here are (1) Ralph W. Thorne, son of Robert H. Thorne, who died testate on October 27, 1930; (2) Ada W. Thorne, widow of the testator, and (3) Joan Stearns Thorne, wife of Ralph W. Thorne and George L. Stearns, II, the latter being the guardian of the minor children of Ralph W. Thorne, aged now respectively 17, 14 and 6 years.

The widow elected to take under the will, which, after setting up trust funds for various legatees, contained provisions in substance as follows: By paragraph 7 the residue of the estate was given to the Lycoming Trust Company in trust, to keep it invested and reinvested in such securities as the trustee shall select and to pay over the income (other than a certain special dividend) as follows:

A. $10,000 annually to testator's wife during her lifetime.

B. The remainder of the income shall be paid to the son, Ralph W. Thorne until the termination of the trust estate.

By paragraph 8 it is provided that the trust shall continue for ten years after testator's death and if testator's wife survives the testator by more than ten years, the trust shall continue until her death. This provision is qualified by the further provisions that the trust may in the trustee's "uncontrolled discretion" and "for any proper reason" be terminated "prior to the time heretofore designated for the termination thereof". This prior termination of the trust could not affect in any way the $10,000 annuity to the widow. It was also provided that "upon termination of said trust estate, the principal fund, together with any accumulated income thereof, shall be paid to my son, Ralph W. Thorne, to be his, his heirs and assigns forever". In the event that Ralph W. Thorne should die prior to the termination of the trust, the income arising from the trust, together with the principal upon the termination of the trust "shall be paid to such person or persons and in such interests and

proportions as . . . Ralph W. Thorne may in his last will . . . direct, limit or appoint and in default of such appointment then such income and upon the termination of the trust the principal thereof shall go to the heirs at law of said Ralph W. Thorne."

On December 24, 1930, the executor filed an inventory of decedent's personal property showing a value of $896,057.03. The chief item in the inventory consisted of 2010 shares of the corporate stock of the Darling Valve and Manufacturing Co., Inc., of a par value of $100 a share and appraised at $375 a share, making the total value $753,750.

The above company was capitalized in the sum of $600,000, divided into 6000 shares of the par value of $100 each. On the date of decedent's death the stock of this company was held as follows:

Robert H. Thorne (the decedent) owned 2010 shares
Ralph W. Thorne " 1000 "
Marshall W. Hough " 747½ "
Estate of Hough " 1495 "
Guardian of Allison H. Hough " 747½ "

The "Thorne interests" thus had 51% of the shares and the "Hough interests" 49%.

In July 1933 the estate of the testator and Seth T. McCormick, Jr., were jointly indebted to the Philadelphia National Bank in the sum of $175,000 and to the Clearfield National Bank in the sum of $15,000. To pay its half of this indebtedness of $190,000 and to pay an additional claim of $5,000 required the estate to secure the sum of $100,000. It did this by selling on July 24, 1933, to Ralph W. Thorne the 2010 shares which it owned of the stock of the Darling Valve and Manufacturing Company for $94,000. Ralph W. Thorne then borrowed $100,000 from this Company and placed with the Company as collateral for the loan 1990 of the shares. Ten shares were sold by Ralph W. Thorne to Marshall L. Hough for $1250, and the remaining ten shares were

placed in trust with D. M. Larrabee. The Hough interests then came into possession of one half of the total stock of the Company. The other half of the stock was distributed as follows: 1000 shares in the hands of Ralph W. Thorne, 1990 shares were pledged as above stated and 10 shares were held by the trustee, D. M. Larrabee.

On September 11, 1933, the executor filed its first and partial account, in which it asked for a credit for a loss of $659,750 occasioned by the sale of the foregoing stock for the sum of $94,000. To this account one creditor filed exceptions and an auditor was appointed. At the hearing the exceptions were withdrawn and the auditor's report was confirmed on November 9, 1933.

On January 2, 1934, the Lycoming Trust Company (i. e., the executor) merged with the West Branch Trust Company under the latter name. The executor filed its second and final account and this was confirmed absolutely on September 19, 1934. It showed a balance for distribution of $1,009.14.

On July 10, 1940, i. e., nearly six years after the executor's final account was confirmed, a petition for review of this account was filed by the appellants. These petitioners alleged (1) That "the Lycoming Trust Company, its officers and agents, its Vice-President and Trust Officer, Charles A. Schreyer, its attorney, Seth T. McCormick, Jr., and Marshall L. Hough, minority stockholder in the Darling Company connived and fraudulently conspired to wrest control of the Darling Company from the Thorne interests" and that "pursuant to said fraudulent scheme the said Seth T. McCormick, Jr., and Charles A. Schreyer represented to Ralph W. Thorne that the only way in which the estate could pay its indebtedness was to sell 2010 shares of Darling Valve and Manufacturing Company stock to him, Ralph W. Thorne, for $94,000 and that he, the said Ralph W. Thorne, would borrow $100,-000 from the Darling Valve and Manufacturing Company and deposit therewith as collateral 1,990 shares of Darling Valve and Manufacturing Company stock. It

was further insisted by Seth T. McCormick, Jr., that even this method of raising the money would not be complied with unless said Ralph W. Thorne would transfer to Marshall L. Hough 10 shares of said stock for a consideration of $1250.00 (which amount was admittedly less than the true value of the stock), thus equalizing control of the corporation between the Thorne and Hough interests. It was also insisted by Seth T. McCormick, Jr., that after said transactions would take place that Ralph W. Thorne and Marshall L. Hough would each place ten shares of Darling Valve and Manufacturing Company stock in trust with his Honor, Judge D. M. Larrabee, of the Courts of Lycoming County, who was to vote said twenty shares of stock at his discretion in order to destroy the effect of neutral control."

It was further alleged that Ralph W. Thorne "strenuously objected to the proposal made to him by Seth T. McCormick, Jr., and Charles A. Schreyer and pointed out various alternatives for raising the money needed, but to no avail."

It is claimed that "as a result of the fraudulent scheme set forth" 2010 shares of the Darling Valve and Manufacturing Company's stock "having a value of $753,750 and upwards" were sold to Ralph W. Thorne for $94,000 and the collateral of 1990 shares of stock was deposited (all of which is above noted). Ralph W. Thorne then received the loan of $100,000 and used $95,-000 in payment of the indebtedness of the estate of his father, Robert H. Thorne, and $5,000 to John E. Cupp, Esq., for services rendered to the Thorne estate.

The allegation then is made "That the sale of the 2010 shares of Darling Valve and Manufacturing Company stock, having a value of $753,750 and upwards, for the sum of $94,000 was wholly illegal and unauthorized and constituted a fraudulent destruction of the trust estate created by Robert H. Thorne, deceased, and was a fraud upon all the beneficiaries of the trust."

In the amended petition filed by Ralph W. Thorne on July 24, 1941, he set forth that "the following addi-

tional transactions and events took place as a part of said conspiracy.": The petitioner owed the West Branch Bank & Trust Company $25,000 and the Bank held 200 shares of the common stock of the Darling Valve and Manufacturing Company owned by Ralph W. Thorne. The Bank refused to accept payment of this note unless Thorne would at the same time pay an additional $10,000 to apply on a mortgage of his real estate then also held by the Bank. Prior to March 27, 1939, "Seth T. McCormick, Jr., had promised and assured Ralph W. Thorne that the said West Branch Bank & Trust Company would in no event sell the 200 shares of stock without first giving him a reasonable opportunity to pay off the said loan and thereby regain possession of the stock." The Trust Company "acting in concert with Seth T. McCormick, Jr., and Marshall L. Hough without notice to Ralph W. Thorne, on the morning of March 27, 1939, proceeded to sell the said note to Marshall L. Hough for the face value thereof and turn over to him the said collateral pledged therewith, to wit, 200 shares of the stock of the Darling Valve and Manufacturing Company." It is further charged that though "ordinarily the annual stockholders' meeting was held on the last Monday of March in the afternoon, the meeting in 1939 was held at 10 A. M. for the first time in the history of the Company and although both the bank officials and Marshall L. Hough knew that Ralph W. Thorne was prepared to procure the money to cover his [$25,000] note on Tuesday morning, March 28, they waited until about noon on Monday and then informed him that if he did not pay it off by 2 o'clock that day, the [200 shares of] stock . . . held as collateral [for the payment of that note] would be sold, well knowing that it would be impossible for him to comply with their demands." He adds that when he could not pay off the note "within the limited time specified, Marshall L. Hough sold the said collateral to himself and thereby received complete control of the . . . Company which was one of the purposes of the con-

spiracy and fraudulent scheme hereinbefore set forth."
Shortly thereafter Thorne was demoted from President
to Vice-President "with a reduction in salary from $12,-
666.00 to $2500.00 annually, and Marshall L. Hough be-
came President at the annual salary of $12,666.00, which
was the same salary he had been receiving as Vice-Presi-
dent of the Company." After these events Thorne "be-
came suspicious of the good faith of the parties con-
cerned and made an effort to secure disinterested counsel
to advise him as to his rights."

The law is settled that the Orphans' Court has no
power to review a final decree confirming the account
of executors when the application for such a review is
made more than five years after the date of the confirma-
tion unless fraud is alleged and proved. This was ex-
pressly ruled in *Stetson's Estate,* 305 Pa. 62, 155 A. 856,
and reiterated in *Elkin's Estate,* 325 Pa. 373, 190 A. 650,
where section 48 of the Fiduciaries Act of June 7, 1917,
P. L. 447, 20 PS 843, was quoted and applied.[1]

By fraud as used in the opinions qualifying the five
years' limitation in section 48 of the Fiduciaries Act is
meant such fraud as operates to prevent the fiduciary or
"any person interested" from taking action within the
five years' period to secure a review of the account. In
*Dalzell v. Lewis,* 252 Pa. 283, 97 A. 407, this court held
that a cause of action arising from fraud is complete
when the transaction has ended and the statute of limita-
tions begins to run at once, unless discovery is prevented
by active concealment. In that case Justice FRAZER
speaking for this court quoted with approval what Jus-

---

[1] This section provides that "within five years after the final
decree confirming the original or supplementary account of any fidu-
ciary" a duly verified "petition of review being presented by" proper
parties specifically "alleging errors in such account, or in any adju-
dication of the orphans' court, or any report of an auditor of such
account, . . . the orphans' court shall grant a hearing . . . and give
such relief as equity and justice may require . . . Provided, That
this act shall not extend to any cause when the balance found due
shall have been actually paid and discharged by any fiduciary."

tice MITCHELL said in *Smith v. Blachley*, 198 Pa. 173, 47 A. 985: "When it [fraud] is accomplished and ended, the rights of the parties are fixed. The right of action is complete. If plaintiff bestirs himself to inquire, he has ample time to investigate and bring his action. If both parties rest on their oars, the statute runs its regular course." In *Kinter v. Com. Tr. Co.*, 274 Pa. 436, 118 A. 392, this court speaking through Justice WALLING said: A plaintiff who charges fraud "is not only chargeable with what he knew but also with what he could have discovered by reasonable diligence." In that case the allegation was that the plaintiff had been induced by three others to sell his stock in a corporation and he remained "silent and inert" for nearly six years after he gave his option and five years after he transferred his stock. See also *Bernath v. Le Fever*, 325 Pa. 43, 189 A. 342, and *Barnes & Tucker Co. v. Fownes et al.*, 334 Pa. 324, 5 A.2d 146.

The facts pleaded by Thorne do not constitute fraud. The essence of fraud is deceit intentionally and successfully practiced to induce another to part with property or with some legal right. Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact or by silence when good faith required expression.[2] Thorne's "strenuous objection" in 1933 to the proposal he stigmatized in 1940 show his disbelief in it. No one is deceived by a declaration he disbelieves. When Thorne was told that "the only way in which the estate could pay its indebtedness was to sell the 2010 shares of . . . stock to him" as a prelude to its hypothecation by him with the Darling Valve and Manufacturing Company for a loan of $100,000 he "pointed

---

[2] "Generally, fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether by direct falsehood or innuendo, by speech or silence, word of mouth, or look or gesture, and is any artifice by which a person is deceived to his disadvantage": *Wiley v. Wirebelauer*, 116 N. J. Eq. 391, 174 A. 20, 23.

out" (so he avers) "various alternatives for raising the money needed, but to no avail." He stated that the Company "had cash on hand and stocks and bonds in an amount upwards of $375,000, of which $213,000 was represented by United States government certificates." Thorne "proposed and insisted that a proper method to supply the estate with the necessary funds to take care of its share of the obligation was by the declaration of a dividend sufficient to supply the estate therewith, and that this was the true intent of the testator." Those who, he claims, defrauded him, "flatly refused to agree to any other plan except the one proposed by them." And because of that he "acquiesced". He thereby became an actor in the transaction and that fact now discredits his claim that he was for a half dozen years disarmed from taking action by the appellees' concealment of the fraudulent transaction in which he was a participant. A person who is sui juris and not acting under duress and who acquiesces in a proposal which he believes to be wrongful and disadvantageous deprives himself of the plea of fraud when later he finds that he has been hurt. "If the representee knew the truth it is obvious that he was neither deceived nor defrauded and that any loss he may sustain is not traceable to the representation but is in effect self-inflicted." : 26 C. J. p. 1135-6, section 55.

Thorne's claim of active fraud which made him so long inert in this matter is that for five and a half years after the confirmation of the executor's first and partial account the appellees "told him not to worry about the business"; that "as their respective fathers had gotten along so well for thirty years there was no reason why the sons, namely, Ralph W. Thorne and Marshall L. Hough, should not continue in business indefinitely; ... not to worry about the [200 shares of] stock which he had pledged as collateral for his loan; as he would be given ample opportunity to pay off the loan; leading Ralph W. Thorne to believe that they wanted to help him, by declaring dividends to pay the interest on his

various obligations during a period of five years, that is, from 1934 to 1939; waiting until after the expiration of the five-year period within which to open up the first and partial account of the Executor-Trustee in the absence of fraud, which period expired in September, 1938, to demand payment of the said [$25,000] note and oust Ralph W. Thorne from his office as President of the Darling Valve and Manufacturing Company at the first meeting held thereafter."

The untenability in law of Thorne's position is, as to the 200 shares of stock referred to, that for a creditor to duly sell the collateral of a past due note does not constitute fraud even though the debtor had been lulled into the belief that he would be given "ample opportunity to pay off the loan", and, as to the 2010 shares of stock referred to, Thorne did nothing for nearly seven years to have the transaction judicially reviewed. In *Stetson's Estate,* supra, this court said as to the duty of "any person injured by the settlement of an account" to seek within five years the redress available to him: "There may be particular cases of hardship in this law but the general benefit of the provisions of these acts of assembly far overbalance these particular cases. These acts, whilst they give to the vigilant every means of redress necessary for their protection, fix a period when all litigation is at an end.": Quoting from *Weiting v. Nissley,* 6 Pa. 141.

In *Riley v. Boynton Coal Co.,* 305 Pa. 364, 157 A. 794, we said: "Our various statutes of limitations and the rulings of chancellors upon pleas of laches are expressive of the feelings of mankind that, where there are wrongs to be redressed, they should be redressed without unreasonable delay, and where there are rights to be enforced, they should be enforced without unreasonable delay." In *Taylor v. Coggins,* 244 Pa. 228, 90 A. 633, appears the following: "Laches is not excused by simply saying: 'I did not know.' If by diligence a fact can be ascertained the want of knowledge so caused is no

excuse for a stale claim. The test is not what the plaintiff knows, but what he might have known, by the use of the means of information within his reach, with the vigilance the law requires of him : *Scranton Gas & Water Co. v. Lacka. Iron & Coal Co.,* 167 Pa. 136, 31 A. 484." In *Stevens v. D. L. & W. R. R. Co.,* 278 Pa. 284, 295, 122 A. 504, this court quoted with approval the following from 5 Pomeroy's Eq. Jur., section 27; " 'The defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of the facts. . . .' " The following was set forth in *Taylor v. Coggins,* 244 Pa. 228, 231, 90 A. 633; "Suits brought after the period of time that the law prohibits actions at law are looked upon with suspicion and unless the defendant is responsible for the want of knowledge of the complainant, it is a rare case that survives if more than six years old." In the instant case the limitation fixed by law is *five* years, as above noted.

Thorne's management of his own affairs was obviously imprudent and he attempts to explain his imprudence by stating that in 1933 he "was under the care of a psychiatrist at the Institute of the Pennsylvania Hospital, Philadelphia, where he was undergoing treatment for alcoholism and its effects, having been admitted to the Institute as a patient on May 5, 1933. He was confined to said Institute from May 19 to May 24, 1933, again from June 15 to June 18, 1933, and from July 27 to July 30, 1933." The 2,010 shares of stock were sold to him, thereby destroying the testamentary trust, on July 24, 1933. Thorne had five years after November 9, 1933 (the date of the first account's confirmation), within which to attempt to void this sale. "A drunkard when in a complete state of intoxication, so as not to

know what he is doing, has no capacity to contract in general; but his contract is voidable only and not void, and may therefore be ratified by him when he becomes sober: Benjamin on Sales, section 33": *Bush v. Breinig*, 113 Pa. 310, 316, 6 A. 86. Thorne's actions and non action before filing a petition for review seven years later were indicative of ratification of the act he now challenges.

The law lends its aid only to those who exercise diligence in invoking it. We said in *Elkins Estate*, 325 Pa. 373, 190 A. 650: "An Orphans' Court decree confirming a duly administered and audited account is binding upon all the world unless fraud be shown." By fraud is meant (as herein pointed out) active deception which stays the hand of parties in interest.

Ada W. Thorne, the widow of testator, is also a "person interested" who asks for a review of the two accounts of the executor. Repeating the charges of Ralph W. Thorne she says: ". . . That the nature of the aforesaid trust created by Robert H. Thorne, deceased, was such that it could neither be destroyed nor terminated by the consent or agreement of all the parties interested. That in no event could a termination of the trust take place without the Trustees making provision for the payment to your petitioner of an annuity of $10,000 as directed in the Will. . . . That your petitioner, Ada W. Thorne, did not acquire knowledge of the fraud and conspiracy set forth in the preceding paragraphs until she was informed thereof by her son, Ralph W. Thorne, after he acquired knowledge thereof in the latter part of June, 1939. . . ."

The 2,010 shares of stock of the Darling Valve and Manufacturing Company were sold at a loss of $659,750; and (quoting from appellee's brief) "as the sale of the assets of the estate [including *that* sale] did not provide sufficient funds to pay claims against the estate [totalling $495,008.81] there was no rest, residue and remainder to set up into a trust." The widow's testamentary

interest was so adversely affected by the sale of the stock at a figure far below its inventoried price, which sale was reported in the First and Partial Account filed on August 11, 1933, that had she taken appropriate action between the time the account was filed and November 9, 1938, she could have obtained "such relief as equity and justice may require". However, she failed to take timely action. She avers that "during the period referred to" she was "aged, ill and infirm and was confined most of the time to her bed both at home and in a hospital and was not informed as to what was being done in connection with the aforesaid estate." The answer to this is that she was represented by counsel at the audit of the First and Partial Account and she was aware that she had received nothing on account of her $10,000 annuity since January 10, 1933. She must have known of the estate's sale of the stock and have tacitly acquiesced in it. This court in *Stetson's Estate,* supra, made it clear that it would *not* construe section 48 of the Fiduciaries Act of 1917 as "giving to a petition litigant the right to decide for himself whether he would proceed under or aside from the statute, telling him that if he took the former course he would limit himself as to the time he might apply for relief, and if he took the latter he would be free from all such limitations; in other words . . . make the statute a piece of useless legislation."

A petition was also filed by (A) George L. Stearns, II, guardian of Robert H. Thorne, II, Anthony Stearns Thorne and Ralph Weymouth Thorne, Jr., children of Ralph W. Thorne, and (B) Joan Stearns Thorne, wife of Ralph W. Thorne. The birth date of these children are respectively, in the order named: August 27, 1924; March 20, 1928, and November 23, 1935. This petition contains substantially the same averments as the petition of Ralph W. Thorne and avers that if the acts they complain of are not remedied "grave injustice and irreparable loss will have been worked upon them."

We agree with the court below that the wife and children of Ralph W. Thorne have no legal standing to

ask for a review of the accounts. The fact that pecuniary loss visited upon Ralph W. Thorne would probably in the natural course of events cause them pecuniary loss does not make them "persons interested" within the meaning of section 48 of the Fiduciaries Act.

Thorne's interest in his father's estate was by the terms of the will *vested* and not contingent. In *Manderson v. Lukens,* 23 Pa. 31, this court said: "The question of vested or contingent is not to be tested by the certainty or uncertainty of obtaining the actual enjoyment; for that would make the character of the estate depend, not upon the terms of its creation, but on the form of the result. Neither does it depend upon the defeasibility or indefeasibility of the right of possession; for many estates are vested without possession, as well as with, which are yet defeasible. If there is a present right to a future possession, though that right may be defeated by some future event, contingent or certain, there is nevertheless a vested estate. An unpossessed estate is vested, if it is certain to take effect in possession, by enduring longer than the precedent estate." The nature of the estate taken by Ralph W. Thorne under his father's will is settled by the decision in *Dodson v. Ball,* 60 Pa. 492, 497, where Justice AGNEW said: "The rule laid down is, that when an estate for *life* only is given, followed by a general power of appointment, and on failure to appoint, to children or to special heirs, the power to appoint will not enlarge the estate of the cestui que trust to a fee, and on a failure to appoint, the children or special donees in remainder take by purchase from the donor, and not by way of limitation as heirs of the cestui que trust: 4 Kent's Com. 663; *Smith v. Starr,* 3 Whart. 66; *Anderson v. Dawson,* 15 Vesey, Jr. 532; *Girard Life Insurance and Trust Co. v. Chambers,* 10 Wright 490. A limitation to heirs on a failure to appoint, unquestionably enlarges a life estate to a fee by the union of estates: *Ralston v. Waln,* 8 Wright 279; *Physick's Appeal,* 14 Id. 128; *Nice's Appeal,* Id. 143."

We cannot agree with appellants that "Ralph W. Thorne has only a contingent remainder in the corpus of the estate". Appellants add : "In order to enjoy the same himself, he must survive his mother and the trust." That fact does not make his remainder a contingent one, for he has a present fixed right of future enjoyment of the estate limited in remainder which right will take effect in possession immediately on the determination of the precedent estate irrespective of any collateral event. As to the true criterion of a vested remainder see 21 C. J. sec. 131, p. 981.

Appellants say : ". . . Where the interest in the first taker is only in the income of an active trust, the rule in Shelley's case and any similar rule such as cited by the respondents below is not applicable, even though the remainder is left to the first taker's heirs." *Deniston v. Deniston,* 263 Pa. 224. In that case we held that under the will "the only gift of the property is to the trustee. To the sons and daughters [who claim the fee] is given but a portion of the net rents." We also said : "Nor is there a gift then of the gross rent from which there might be implied a gift of the property out of which the rent issues." In *Eichelberger's Estate,* 274 Pa. 576, 118 A. 555, this court held that on a gift for life with remainder over, the courts will hold the remainderman takes a vested estate, unless it plainly, manifestly and indisputably appears that testator intended to make his right contingent on his surviving the life tenant.

The "rule in Shelley's case",[3] referred to in appel-

---

[3] This rule is expressed by Chancellor KENT as follows : "Where a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of any interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons to take in succession from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." Quoted in *Daniel v. Whartenby,* 17 Wall. 639, 21 U. S. (L. ed.) 661. Chief Justice GIBSON in *Hileman et al. v. Bouslaugh,* 13 Pa. 344, 350, said of this

lants' brief, has nothing to do with this case except by way of analogy. In *Yarnall's Appeal*, 70 Pa. 335, Justice AGNEW, speaking for this court, says that "all the authorities agree that this rule has no place in the interpretation of a will, and takes effect only when the interpretation has been first ascertained. . . . The rule is no medium for finding out the intention of the testator; on the contrary the rule supposes the intention already discovered. . . . When it is once settled that the donor or testator has used words of inheritance according to their legal import, has applied them intentionally to comprise the whole line of heirs, of the tenant for life, and has really made them the terminus or ancestor, by reference to whom the succession is to be regulated, then comes the proper time to inspect the rule in Shelley's case . . . When the testator devises the remainder on a failure to appoint, to the heirs of the life-tenant, or by words which mean the same thing, the inheritance will pass to the life-tenant . . . If the body of persons thus described constitute in fact the heirs of the life-tenant and represent only a line of descent, and not specially designated persons, the devise for life becomes the source or stock of the descent, and by analogy to the rule in Shelley's case, or perhaps it is better to say, from necessity, he takes the inheritance . . . I have used the expression, by analogy to the rule in Shelley's case, to avoid misapprehension."

"The rule in Shelley's case itself shows that it has reference only to estates in real property, but it repeatedly has been held to apply to personalty, and hence to leaseholds. When resorted to in connection with personal estate it is only by way of analogy and as a rule of con-

---

rule: "The use of it, while fiefs were predominant, was, to secure the fruits of the tenure, by preventing the ancestor from passing the estate to the heir, as a purchaser, through a chasm in the descent, disincumbered of the burdens incident to it as an inheritance." He adds that Justice BLACKSTONE and others "ascribe it to concomitant objects of more or less value at this day; among them, the unfettering of estates, by vesting the inheritance in the ancestor, and making it alienable a generation sooner than it would otherwise be."

struction in order to promote the intention, and yields more readily to the apparent intention of the testator than it does in the case of realty." : 24 R. C. L. section 19, p. 907.

In the instant case the testamentary provision heretofore quoted shows that the testator's intent was to vest the estate absolutely in his son, subject only to the precedent estate which would terminate at the death of the widow.

Subject to his mother's precedent estate, that is, an annuity of $10,000 for life, Ralph W. Thorne inherited absolutely the corpus and income of the trust estate and therefore his wife and children have no standing in law to except to the executor's account.

The decree is affirmed at appellants' cost.

Mr. Justice DREW dissents.