## McClellan Estate.

Argued April 19, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*Robert W. Smith,* with him *Louis E. Sensenich* and *Smith, Best & Horn,* for appellants.

*John G. Buchanan,* with him *Scott Fink, R. T. Jennings, Jr., John G. Buchanan, Jr., Smith, Buchanan & Ingersoll* and *Fink & Jennings,* for appellee.

OPINION BY MR. JUSTICE BELL, September 25, 1950:

The widow of the decedent duly filed her election to take against his will. Eight months later the executors filed a petition praying that the election to take against the will should be stricken from the records because the widow and the decedent had entered into an ante-nuptial agreement specifically fixing the amount or share of decedent's estate to which the widow should be entitled. The court dismissed the petition on the ground that the provision for the widow was unreasonable and grossly inadequate and that the decedent had not made a full and fair disclosure to his fiancee of his worth.

Dr. McClellan, the decedent, was married to the respondent on May 15, 1943, and they lived together for four years and five months until the decedent's death. At the time of the marriage the Doctor was 80 years old and the respondent 58. Each of them had been married before, the Doctor having several children and the respondent one child by a prior marriage.

Decedent by his will gave his wife $5000. pursuant to said ante-nuptial agreement; as well as household furniture and effects, and the right to live in their apartment without payment of any rent or taxes (in connection with said premises) as long as his wife remained his widow. The $5000. legacy and the furniture and effects were bequeathed free of tax. Decedent gave respondent at some undisclosed time prior to his death, securities worth approximately $15,000.

Respondent and her first husband rented the Doctor's home for $40. a month and the Doctor paid respondent $50. a month for an apartment in said home and for board and lodging. This arrangement continued for several years. A year after the death of respondent's first husband she and the Doctor entered into the aforesaid ante-nuptial agreement which provided in the first paragraph thereof that his "Executors . . . shall pay

to her the sum of $5,000.00 in full satisfaction, payment, and discharge of any and all claims that the party of the second part may have under any and all laws as his widow or heir at law . . . ." The agreement also provided as follows: "Fifth: This agreement is entered into by each party with full knowledge . . . of the extent and probable value of all the property, or estate, of the other, . . . ." *Attached to the ante-nuptial agreement* and offered in evidence by the decedent's executors was a paper which was found in the possession of the decedent and was signed by the respondent and duly witnessed: ". . . He has bought and holds in his own name the following real estate", naming four properties valued at $68,000. "and bank stocks worth $15,000., Jersey and other stocks $20,000., and bonds worth about $90,-000., but that for fear something was under-estimated, or forgotten, we added $7,000". The parties agreed that the actual value of the Doctor's real estate at the time was $70,100., so that he made a substantially correct disclosure of his real estate. However, at the time of the ante-nuptial agreement, the bank stocks had an actual value of $86,152.50; Jersey and other stocks $147,379.98; bonds $249,778.23; cash in banks $36,-376.55. In other words the Doctor had disclosed personal property of $132,000., whereas the actual value of his personal property was $519,727. (less liabilities of $10,500). The Doctor had also conveyed under a trust agreement a major portion of his estate to a trustee for the benefit of his descendants, viz, insurance policies which had a cash surrender value of $67,134. The respondent knew of this and it has not been taken into consideration by the parties or by the courts in deciding this case.

At the time of the Doctor's death, his assets, excluding insurance policies, totalled $675,500., made up of securities and cash of $580,000. and real estate of $95,-500. There was no evidence as to the testator's income

during his life, but from accounts filed after his death it appeared that he had an annual income from securities and real estate alone of approximately $19,608.

At the time of the ante-nuptial agreement the respondent owned a house worth $6,000. which had a gross annual rental value of $600. and household goods and cash aggregating $1,000. After his death she received Social Security benefits of approximately $400. a year.

Ante-nuptial agreements depend for their validity upon the presence of one of two factors, namely: A reasonable provision for the wife, or in the absence of such provision, a full and fair disclosure to the wife of the husband's worth: *Flannery's Estate,* 315 Pa. 576, 580, 173 A. 303; *Warner's Estate,* 210 Pa. 431, 59 A. 113; *Emery Estate,* 362 Pa. 142, 66 A. 2d 262.

Where the provision made for the wife is grossly disproportionate to the value of the husband's estate, fraudulent concealment will be presumed and the burden of proof thrown on him to show that full disclosure had been made: *Flannery's Estate,* 315 Pa. 576, 173 A. 303; *Warner's Estate,* 210 Pa. 431, 59 A. 113; *Neely's Appeal,* 124 Pa. 406, 16 A. 883; *Groff's Estate,* 341 Pa. 105, 19 A. 2d 107; *Clark's Estate,* 303 Pa. 538, 154 A. 919.

It is also well established that in considering the adequacy of the provisions for a wife in an ante-nuptial agreement, all of the relevant facts and circumstances surrounding the case must be considered; and the true test of adequacy is whether the provision for the intended wife is sufficient to enable her to live comfortably after her husband's death in substantially the same way as, considering all the circumstances, she had previously lived: *Groff's Estate,* 341 Pa. 105, 19 A. 2d 107; *Neely's Appeal,* 124 Pa. 406, 16 A. 883; *Clark's Estate,* 303 Pa. 538, 154 A. 919.

Considering all the facts and circumstances in this

case, the provision for his future wife in the ante-nuptial agreement plus the decedent's gift to her of $15,000., was very unreasonable and grossly inadequate. Fraudulent concealment will therefore be presumed and decedent's executors had the burden of proving that decedent had made a full and fair disclosure of his worth at the time of the ante-nuptial agreement. The executors contend that such a disclosure was made because the agreement recites that it "is entered into by each party with full knowledge on the part of each of the extent and probable value of all of the property, or estate, of the other . . . ". Such a provision is prima facie evidence that a full and fair disclosure had been made by the husband to the wife of his worth: *McCready's Estate,* 316 Pa. 246, 175 A. 554; *Smith's Appeal,* 115 Pa. 319, 8 A. 582; *Emery Estate,* 362 Pa. 142, 66 A. 2d 262. However, this statement in the agreement is rebutted and completely overcome by the facts which appeared in detail in said agreement, namely, that the Doctor had unintentionally or intentionally materially misrepresented the value of his personal property in that he disclosed said property had a value of $132,000., whereas its value was $519,000.

For these reasons, it is apparent that there was neither a reasonable, adequate provision for his wife nor a full and fair disclosure to the wife of the husband's worth. However, the agreement further recites that the parties intended "to be legally bound hereby notwithstanding the extent or size of the estate of the other"; and the executors therefore contend that the value of the Doctor's estate and any misrepresentation with respect thereto was immaterial. We can not agree with this contention.

This agreement was entered into and executed by the Doctor's fiancee under unusual circumstances. Dr. McClellan's attorney prepared the agreement and brought with him and paid his office attorney or as-

sistant to represent the Doctor's fiancee. No disclosure or explanation was made to her at that time and no inquiry was made as to decedent's worth except what was set forth in the ante-nuptial agreement and in the aforesaid paper which was attached to and became a part of the ante-nuptial agreement.

It is obvious that Dr. McClellan stood in a confidential relationship to his fiancee and that she did not have independent counsel or independent advice. Moreover, a very material misrepresentation, wittingly or unwittingly, was made to her by the Doctor as to the value of his property. There is no doubt that she was overreached and that the agreement was voidable at her election.

Parties to an ante-nuptial contract providing for the disposition of their estates do not deal at arms' length but stand in a relation of mutual confidence and trust that calls for the highest degree of good faith and a full and fair disclosure of all pertinent facts and circumstances, without concealment or misrepresentation: *Whitmer's Estate,* 224 Pa. 413, 73 A. 551; *Groff's Estate,* 341 Pa. 105, 19 A. 2d 107.

The language of Mr. Justice, now Chief Justice DREW, in *Reichert Estate,* 356 Pa. 269, 274, 51 A. 2d 615, is particularly applicable: " 'As a general rule, fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage': . . . . In this connection, we said in Thorne's Estate, 344 Pa. 503, 511, 25 A. 2d 811: 'The essence of fraud is deceit intentionally and successfully practiced to induce another to part with property or with some legal right. *Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact*\*

or by silence when good faith required expression.' . . . The inherent right of a court to set aside a contract for fraud is fundamental."

A similar rule is set forth in Restatement, Contracts, section 476 (1) p. 908: "Where a party is induced to enter into a transaction with another party that he was under no duty to enter into by means of the latter's fraud or material misrepresentation, the transaction is voidable as against the latter. . . .".

When material misrepresentations have been made it will be presumed, in the absence of facts to show the contrary, that the contract was made in reliance thereon: *New York Life Insurance Company v. Brandwene,* 316 Pa. 218, 172 A. 669; Restatement, Contracts, sec. 479; Pomeroy's Equity Jurisprudence, 5th ed., sec. 891; Black on Rescission and Cancellation, 2nd ed., sec. 677.

The Doctor's material misrepresentations, unintentionally or intentionally made, constituted a violation of the confidential relationship which existed between himself and the lady he was about to marry and amounted, under the aforesaid authorities, to constructive fraud. The aforesaid ante-nuptial agreement was therefore voidable at the option of the Doctor's future wife and did not bar the widow's election to take against his will.

Decree affirmed at appellants' cost.

* Italics throughout, ours.