487 A.2d 901

**In re ESTATE OF George W. GEYER, late of the Borough of Chambersburg, Franklin County, Pennsylvania, Deceased.**

**Appeal of George W. GEYER.**

Superior Court of Pennsylvania.

Argued Aug. 15, 1984.

Filed Jan. 18, 1985.

Petition for Allowance of Appeal Granted Aug. 9, 1985.

160

Joseph Roda, Lancaster, for appellant.

Thomas J. Finucane, Chambersburg, for appellee.

Before WICKERSHAM, JOHNSON and HOFFMAN, JJ.

HOFFMAN, Judge:

The issues on appeal are whether the antenuptial agreement in question was valid and, if so, whether it had been

breached. We find that the agreement was enforceable and, accordingly, reverse the order below.

On January 9, 1977, 68-year-old George W. Geyer, II, the decedent, married 56-year-old Rosalie S. Geyer, appellee, in Chambersburg, Pa. Decedent had been previously married twice, and both of his former wives had predeceased him. Appellant, George W. Geyer, III, is decedent's son from his first marriage and his sole heir. Appellee also had two prior marriages, and the three children born to her first marriage are all married with families and in good financial condition. Decedent died testate at the age of 74 on May 1, 1982. On May 7, 1982, his will dated July 13, 1981 was probated and letters testamentary were issued to appellant as the executor of the estate. The will provides, *inter alia*, the following:

SECOND. I give, devise and bequeath my home residence at 542 Guilford Avenue, Chambersburg, Pennsylvania, and the sum of Twenty Thousand ($20,000.00) Dollars, to my wife, Rosalie S. Geyer [appellee], in accordance with the terms of our anti-nuptial [sic] agreement dated December 30, 1976.

THIRD. I give, devise and bequeath all the rest, residue and remainder of my estate whatsoever and wheresoever situate, to my son, George W. Geyer, III, [appellant] absolutely, if he is living at the time of my death.

On May 8, decedent's safe deposit box at his bank was opened by appellant and his attorney in the presence of the bank's branch manager. Among the contents of the box, they found an antenuptial agreement, which is set forth in its entirety as follows:

## ANTE–NUPTIAL AGREEMENT

MADE this *30th* day of *December*, in the year nineteen hundred and seventy-*six* (197*6*);

BETWEEN George W. Geyer, of the Borough of Chambersburg, Franklin County, Pennsylvania, FIRST PARTY,

AND

Rosalie Werner, of Greene Township, Franklin County, Pennsylvania, SECOND PARTY.

WHEREAS, the said parties contemplate entering into marital relations with each other and each of the parties has been previously married;

WHEREAS, the first party is possessed of real and personal property, and the ownership and operation of Geyer Lumber & Millwork Co., Inc., the fuel oil business, and Geyer's Kraft Korner, Inc.;

WHEREAS, the first party has a son, George W. Geyer, III, five grandchildren, and six great grandchildren;

WHEREAS, the second party's heirs are three children and ____ grandchildren; and

AND WHEREAS, the parties hereto, both having full knowledge and understanding of the other party's financial worth and financial position, agree with the other that their existing legal rights or the existing legal rights of their children and heirs shall not be affected by the proposed marriage as herein stated:

NOW, THEREFORE, it is mutually agreed as follows:

1. That the first party shall, during the continuance of his marriage with the second party, provide a home for the second party and shall use his income to provide reasonable support, maintenance and medical expenses for the second party, and *upon the death of the first party if the second party survives him, then the first party will either devise or convey to the second party the residence property, free and clear of all encumbrances, including the household furniture and furnishings less certain items which will be designated for his child or grandchildren.*

2. That *upon the death of the first party, the second party surviving him and living with him at the said time as his wife, shall be awarded, given or*

*bequeathed a sum of Twenty Thousand ($20,000.00) Dollars to provide a substantial contribution to her way of living.*

3. That the first party agrees with the second party and the second party agrees with the first party that *in consideration of the two previous provisions by the first party, the second party will not make any claim to or file an election to any other portion of the first party's estate.*

4. That the first party, in consideration of these agreements, understands and agrees that the second party may dispose of her estate in any way she wishes to do so, either by gift, devise or by will.

5. That it is expressly agreed that by virtue of the said marriage, neither party hereto shall have or acquire any right, title or claim in or to the real or personal estate of the other, except as herein provided, and the estate of each shall descend to and vest in his or her heirs-at-law, legatees or devisees as may be prescribed by his or her last will and testament.

6. That it is expressly agreed that if either party shall mortgage, sell or convey his or her real estate, the other party hereto shall upon request join in any and every mortgage, deed, or other instrument that may be necessary for the eventual transfer of the same.

7. That this agreement is entered into by each party with full knowledge on the part of each of the extent and probable value of all of the property, or estate, of the other, and of all the rights, that but for this agreement, would be conferred by law upon each of them in the property, or estate, of the other, by virtue of the consummation of the said proposed marriage; and it is the express intention and desire of the parties hereto that their respective rights in and to each other's property, or estate, of whatsoever character the same may be, shall be determined and fixed by this agreement, and not otherwise.

8.  That this agreement shall bind the parties hereto, their heirs, executors and assigns.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, the day and year first above written.

WITNESS:

|  | /s/ George W. Geyer    (SEAL) |
|---|---|
|  | GEORGE W. GEYER |
|  | FIRST PARTY |
|  | /s/ Rosalie Werner    (SEAL) |
|  | ROSALIE WERNER |
|  | SECOND PARTY |

(Emphasis added).  Although there is no evidence as to the identity of the individual who dated the agreement or as to the actual date that decedent and appellee signed the agreement, the lower court concluded that the agreement was executed sometime between December 28, 1976, and April 4, 1977, which was the earliest date that the decedent could have placed the agreement in his safe deposit box because the bank's records disclosed the absence of any entries in the box between May 11, 1976 and April 4, 1977.

On July 2, 1982, appellee filed her election to take against the will.[1]  Appellant then filed a petition on July 15 to vacate and set aside the election on the ground that it was contrary to and in violation of the December 30, 1976 antenuptial agreement.  Appellee filed an answer denying that she ever entered into or executed the agreement. Following a series of hearings on August 10 and 11, 1982, October 21, 1982, and January 24, 1983, the lower court denied appellant's petition to vacate in a March 22, 1983 Order and Opinion.  Although the court concluded from witnesses' testimony that appellee was aware of the ante-

1.  On May 1, 1982, the date of the decedent's death, a spouse taking against the will of a deceased spouse where there was but one child was entitled to receive one-third (⅓) of the decedent's estate.  See 20 Pa.C.S.A. § 2203 (adopted 1978).

On December 30, 1976, the date of the antenuptial agreement, a surviving spouse taking against the will where there was but one child was entitled to receive fifty percent (50%) of the deceased spouse's estate.  See 20 Pa.C.S.A. § 2508 (repealed 1978).

nuptial agreement and had signed it,[2] it also found that: (1) Decedent had breached the agreement by failing to bequeath to appellee in his will "the household furniture and furnishings" as promised in the agreement; (2) Decedent did not make a reasonable provision for appellee in the antenuptial agreement; and (3) Decedent did not make a full and fair disclosure of his worth to appellee in connection with the antenuptial agreement. This appeal from the March 22, 1983 order followed.[3]

■ We must first determine whether the antenuptial agreement was a valid contract.

Parties to an Antenuptial Agreement providing for the disposition of their respective estates do not deal at arm's length, but stand in a relation of mutual confidence and trust that calls for the highest degree of good faith and a reasonable provision for the surviving spouse, *or* in the absence of such a provision a full and fair disclosure of all pertinent facts and circumstances. *Gelb Estate,* 425 Pa. 117, 123, 228 A.2d 367; *Kaufmann Estate,* 404 Pa. 131, 136, 171 A.2d 48; *McClellan Estate,* 365 Pa. 401, 407, 75 A.2d 595; *Whitmer's Estate,* 224 Pa. 413, 73 A. 551.

However, it is too often forgotten that one of the two principal purposes of an Antenuptial Agreement is to change the provisions which the statutory law of Pennsylvania makes for a surviving spouse. *Emery Estate,* 362 Pa. 142, 147, 66 A.2d 262.

(1) An Antenuptial Agreement is presumptively valid and binding upon the parties thereto.

(2) *The person seeking to nullify* or avoid or circumvent the Agreement has the burden of proving the invalidity of the Agreement by clear and convincing evidence

2. Appellee has not appealed the lower court's finding that she did, in fact, knowingly sign the antenuptial agreement.

3. The notice of appeal was filed April 11, 1982. The lower court then ordered appellant to file a Pa.R.A.P. 1925(b) statement of the matters complained of on appeal, which appellant did on May 5. On June 9, the court filed a supplemental opinion affirming its March 22, 1983 decision.

that the deceased spouse at the time of the Agreement made *neither (a) a reasonable provision for the intended spouse, nor (b) a full and fair disclosure* of his (or her) worth. *Gelb's Estate,* 425 Pa. 123, 228 A.2d 367, supra; *Kaufmann's Estate,* 404 Pa. 136, 171 A.2d 48, supra; *McClellan's Estate,* 365 Pa. 407, 75 A.2d 595, supra; *Emery's Estate,* 362 Pa. 142, 146, 66 A.2d 262, supra; *Snyder's Estate,* 375 Pa. 185, 188, 100 A.2d 67.

(3) In evaluating the reasonableness of the provision for the survivor, such reasonableness must be determined *as of the time of the Agreement* and not by hindsight. *Gelb's Estate,* 425 Pa. 123, 228 A.2d 367, supra; *Kaufmann's Estate,* 404 Pa. 137, 171 A.2d 48, supra. *Reasonableness* will depend upon the totality of all the facts and circumstances *at the time of the Agreement,* including (a) the financial worth of the intended husband; (b) the financial status of the intended wife; (c) the age of the parties; (d) the number of children each has; (e) the intelligence of the parties; (f) whether the survivor aided in the accumulation of the wealth of the deceased spouse; and (g) the standard of living which the survivor had before marriage and could reasonably expect to have during marriage.

(4) Full and fair disclosure does not require the disclosure of the *exact* amount of his or her property: *Kaufmann Estate,* 404 Pa. 136, 171 A.2d 48, supra; *Emery Estate,* 362 Pa. 146, 66 A.2d 262, supra; *Holwig Estate,* 348 Pa. 71, 74, 33 A.2d 915; *McCready's Estate,* 316 Pa. 246, 255, 175 A. 554.

(5) Even where there is a valid Antenuptial Agreement, this does not prohibit subsequent inter vivos gifts and testamentary bequests to a surviving spouse.

*Estate of Friedman,* 483 Pa. 614, 626–27, 398 A.2d 615, 621–22 (1978), *quoting Hillegass Estate,* 431 Pa. 144, 149–51, 244 A.2d 672, 675–76 (1968) (emphasis in original). *Accord, In re Estate of Kester,* 486 Pa. 349, 353–54, 405 A.2d 1244, 1246 (1979); *Harrison Estate,* 456 Pa. 356, 359–60, 319 A.2d 5, 6–7 (1974); *Ratony Estate,* 443 Pa. 454,

460–61, 277 A.2d 791, 794–95 (1971); *Perelman Estate,* 438 Pa. 112, 114, 263 A.2d 375, 376 (1970); *Vallish Estate,* 431 Pa. 88, 92, 244 A.2d 745, 747 (1968); *Barnhart v. Barnhart,* 376 Pa. 44, 53, 101 A.2d 904, 908 (1954). Thus, the validity of an antenuptial agreement depends upon the presence of *one* of two factors: a reasonable provision for the wife, or, in the absence of such provision, a full and fair disclosure to the wife of the husband's worth.[4] *Kaufmann Estate,* 404 Pa. 131, 136, 171 A.2d 48, 136 (1961); *Zeigler Estate,* 381 Pa. 436, 440, 113 A.2d 271, 273 (1955); *Groff's Estate,* 341 Pa. 105, 112, 19 A.2d 107, 111 (1941); *Belsky v. Belsky,* 196 Pa.Superior Ct. 374, 376–77, 175 A.2d 348, 349–50 (1961).

> The test of the reasonableness of the provision for the wife is not whether she would receive as much as she would be legally entitled to receive in the absence of the antenuptial agreement, but whether the provision for her is sufficient to enable her to live comfortably after her husband's death, in substantially the same way as she lived prior to the marriage, considering all the circumstances[.]

*Emery Estate,* 362 Pa. 142, 147, 66 A.2d 262, 265 (1949) (citations omitted). *Accord, McClellan Estate,* 365 Pa. 401, 405, 75 A.2d 595, 597 (1950); *Groff's Estate, supra* 341 Pa. at 110, 19 A.2d at 110.

Here, the relevant facts are as follows: Appellee's second husband had been a chemical engineer earning approximately $35,000 a year which permitted him and his wife to enjoy a comfortable lifestyle, all of the necessities of life, a social life, and the capability to make investments. After he died of cancer on March 16, 1976, appellee moved from Fairfield, Illinois, to Chambersburg, Pennsylvania, on August 1, 1976, to be close to her sister. She moved into a townhouse which required a monthly rental payment of $175. At that time, appellee had $30,000 in certificates of deposit paying

4. "The alternative requirement of either full disclosure or reasonable provision is intended to guarantee that the potentially surviving spouse was fairly treated and did not unwittingly abandon valuable statutory rights of inheritance." *Perelman Estate,* 438 Pa. 112, 114, 263 A.2d 375, 376 (1970).

9% interest per annum which she had purchased from life insurance proceeds on the death of her second husband, a $5,000 second mortgage on the home she had sold in Fairfield, and a $4,000 checking account; she furnished the townhouse with new furniture and some antiques. She was paid $108/week for playing the piano at Schoenberger's Restaurant and earned $75/week teaching piano to 15 students at $5 per student. She also received a United States Navy Pension in the amount of $125 per month by reason of the death of her second husband which was payable until her death or remarriage.

In mid-October 1976, appellee was hospitalized for several days for alcohol abuse and, while in the Chambersburg Hospital, met the decedent who was a leader and active member of the Chambersburg Chapter of Alcoholics Anonymous. At that time, decedent was a successful businessman with oil, real estate and lumber interests, and a net worth of approximately $600,000. Appellee and decedent saw each other daily, and decedent began talking about marriage within two weeks of their meeting. Appellee told decedent that she did not want to get married because she had the Naval pension for life. Decedent dismissed the argument by offering $20,000 to replace the pension. Appellee also told decedent that she wanted her own home and decedent replied that he would put his home in both their names. On January 4, 1977, appellee agreed to marry the decedent.

During their five-year marriage, decedent never gave appellee the $20,000 nor conveyed his home to her. Appellee testified that she spent $10,000 of her own money on clothes and on medico-hospital, automobile and life insurance premiums. Decedent gave her for her own use 75% of all of the rentals ($90–100 month) on a cottage on his property. He also gave her gifts, including expensive items such as a $3,000 electric piano. In 1982, he purchased a used 1980 Oldsmobile Cutlass automobile for appellee for $6,000 in cash plus a trade-in of her automobile. He paid most of her medical expenses and gave her cash for house-

hold expenses. When the decedent began receiving social security payments of $760/month, he deposited them in a joint account for their joint use. He also caused her to be covered by the Geyer Lumber and Millwork Company medical insurance program. He encouraged appellee to take courses toward her Bachelor of Arts Degree in Music at Wilson College and paid her tuition. When appellee's mother came to Chambersburg to live, decedent provided her with a rent-free apartment in an apartment complex that he owned and paid her utility bills.

At the date of decedent's death, appellee's assets were $2,000 in a checking account, $2,000 in a savings account, one $15,000 certificate of deposit, and $80 in a joint checking account with the decedent. Other than interest income, her sole independent source of income was $50/week from giving piano lessons to ten students. Subsequent to decedent's death, appellee received $5,000 from Aetna Life Insurance Company on her husband's death, the decedent's "profit-sharing check" of approximately $10,000, a joint income tax refund for overpayment of 1981 taxes in the amount of $7,700, and $9,752.18 from the Hartford Life Insurance Company on a life insurance policy payable on the death of the decedent. In July 1982, appellee became eligible to receive social security as a result of decedent's earnings, and she received $664 in that month and anticipates receiving a like sum each month for life. Under the antenuptial agreement, she was to receive (1) the decedent's home at 542 Guilford Avenue, Chambersburg, which had a fair market value of approximately $50,000 as of December 30, 1976; (2) the household furniture and furnishings (less certain specified items) with an estimated value of $10,173.50; and (3) $20,000 cash. Thus, the total cash value appellee would receive was approximately $80,173.50. Charles J. Schlichter, Jr., a financial planner involved with annuities, investments and life insurance, testified that $20,000 invested by or for a 56-year-old female in December 1976 in an annuity which provided for the systematic liquidation of the principal and income and with no survivors

benefits would provide monthly payments of $128.89 per month to the annuitant for life.

█ Under these circumstances, we find that the provision in the antenuptial agreement was sufficient to enable appellee to live comfortably after the decedent's death in substantially the same, if not better, manner than that she enjoyed prior to the marriage. Thus, we hold that appellee has failed to prove by clear and convincing evidence that the provision for her in the antenuptial agreement was unreasonable. *See, e.g., Emery Estate, supra; Groff's Estate, supra.*

█ Having found that the provision was reasonable, that conclusion would ordinarily end our inquiry and obviate the need to decide whether there was full and fair disclosure. However, our Supreme Court has stated that "[w]here the provision made for the wife is grossly disproportionate to the value of the husband's estate, fraudulent concealment will be presumed and the burden of proof thrown on him to show that full disclosure had been made." *McClellan Estate, supra* 365 Pa. at 405, 75 A.2d at 597; *Flannery's Estate,* 315 Pa. 576, 580, 173 A. 303, 304 (1934). *See also Groff's Estate, supra* 341 Pa. at 110, 19 A.2d at 110 (where no provision is made for wife or provision made for her is unreasonably disproportionate to the then means of the intended husband, it raises presumption of designed concealment and throws burden on those alleging the validity of the agreement to show that it was fairly made); *Clark's Estate,* 303 Pa. 538, 543, 154 A. 919, 920 (1931) (if provision was unreasonably disproportionate to future husband's means, it raises presumption of designed concealment and throws burden upon those alleging validity of the agreement to show that it is fair). Here, the antenuptial agreement provided for appellee to receive approximately $80,173.50, or 13.4% of the decedent's total estate. As of December 30, 1976, the total value of the decedent's real estate, household goods, securities, coin collection and savings account was $782,385.91, and his total obligations were $188,013.02, leaving him with a net worth of $594,372.89.

Assuming, then, that the provision under the agreement can be considered grossly disproportionate to the value of the decedent's estate, we nevertheless find that there was full disclosure.

■ First, the antenuptial agreement signed by appellee recited that the parties had "full knowledge and understanding of the other party's financial worth and financial position." This provision is prima facie evidence that a full and fair disclosure had been made by the decedent to appellee of his worth. *See McClellan Estate, supra* 365 Pa. at 406, 75 A.2d at 597. "If one who signs a paper can read and write, and is under no duress when he or she signs it, 'the law presumes that, under such circumstances, [it is signed] with full knowledge of its contents': ..." *McCready's Estate*, 316 Pa. 246, 255, 175 A. 554, 557 (1934) (citations omitted). *See also Emery Estate, supra* 362 Pa. at 147, 66 A.2d at 265. Next, the record reveals that prior to December 30, 1976, appellee was aware of the facts that the decedent enjoyed a very comfortable lifestyle, dressed well, lived well, had five or six telephones and four television sets in his home, and had employees from the company do the yard and maintenance work around the home. She had visited the decedent in his home, been shown through it, met his housekeeper and observed its furnishings. She described it as a comfortable home located on a two-acre tract with an in-ground pool, a nice yard, a two-car garage, and a cottage. The decedent had shown her the exterior of the Geyer Lumber and Millwork Company, and told her that that was to go to his son. At that time, she was aware of the Geyer Oil Company trucks, fuel oil business and oil tanks behind the decedent's home, and understood it to be part of the business which was to stay in the Geyer family. She was also aware of the fact that decedent and/or his family owned real estate where the foundation of an apartment building was being laid. Decedent had also mentioned Geyer Kraft Korner to her but had said that it belonged to his previous wife, who had left it either to the corporation or to their granddaughter.

■ Although decedent never, as far as we can tell from the record, provided appellee with specific information on the value of his real estate holdings, investments, business, or income, in order for an antenuptial agreement to be valid, it is not necessary that each party have exact knowledge of the worth of the other contracting party. *Emery Estate, supra* 362 Pa. at 146, 66 A.2d at 264; *Holwig Estate,* 348 Pa. 71, 75, 33 A.2d 915, 917 (1943); *McCready's Estate, supra* 316 Pa. at 253, 175 A. at 556.

We also note that the circumstances surrounding the execution of the antenuptial agreement are rather sketchy. Prior to December 28, 1976, the decedent conferred with his attorney and instructed him as to what he wanted in an antenuptial agreement between the decedent and appellee which the attorney was to prepare. According to a notation on the attorney's file copy, the decedent picked up the two original unexecuted and undated antenuptial agreements on December 28, 1976, and took them with him for signing. Another notation on the file copy disclosed that as of March 1977, decedent had both existing originals in his possession, and an undated notation stated: "Margery brought them back". When the agreement was found in decedent's safe deposit box on May 8, 1982, it was dated and signed by both the decedent and appellee. "If there is no evidence of what took place at the execution of the agreement which the appellant seeks to have set aside, it is presumed there was no designed concealment or imposition." *McCready's Estate, supra,* 316 Pa. at 255, 175 A. at 557.

■ At the time of the execution of the antenuptial agreement in the instant case, appellee was an intelligent 56-year-old woman of some determination as evidenced by her initial refusals to marry decedent despite his persistence and her insistence on the security of a home and a life pension. Under the circumstances of this case, we see no reason to invalidate an antenuptial agreement entered into by parties of mature years with separate children and separate estates where there is no evidence of fraud or wrongdoing. If an elderly person marrying another elderly

person is provided, after the spouse's death, with comfortable support, he or she has no just cause to complain. *McCready's Estate, supra,* 316 Pa. at 254–55, 175 A. at 557. *See, e.g., Perelman Estate, supra; Zeigler Estate, supra; Emery Estate, supra.*

Having concluded that the antenuptial agreement is valid, we must now determine whether decedent breached that agreement. The lower court, in allowing appellee to take against the will, found that there was a breach because decedent failed to bequeath to appellee in his will the household furniture and furnishings as promised in the antenuptial agreement. Appellant argues that the court's construction of the decedent's will was erroneous. We agree.

> "It is, of course, a cardinal rule that a will is to be construed according to the intent of the testator." ... Where a court feels that it can with reasonable certainty ascertain the intent of the testator through examination of the will itself, the court generally does not look to matters external to that document.... Where, however, a court cannot feel such confidence in distributing the estate by reference to the will only, or where a latent ambiguity is discovered, it is proper and necessary to inquire into the circumstances of the testator at the time of execution of his will and other evidence which bears on intent.

*Estate of Schwenk,* 326 Pa.Superior Ct. 253, 258, 473 A.2d 1078, 1080 (1984), *quoting Estate of Taylor,* 480 Pa. 488, 494, 391 A.2d 991, 994 (1978) (citations omitted). "In ascertaining testamentary intent, the court examines the language of the will, the scheme of distribution, the circumstances surrounding the execution of the will and other relevant facts." *Estate of Schwenk, supra. Accord, Estate of Stewart,* 325 Pa.Superior Ct. 545, 552, 473 A.2d 572, 575 (1984); *Matter of Estate of Coniglio,* 324 Pa.Superior Ct. 527, 538–539, 472 A.2d 205, 211 (1984); *Estate of Tower,* 323 Pa.Superior Ct. 235, 246, 470 A.2d 568, 574 (1983); *Estate of McCredy,* 323 Pa.Superior Ct. 268, 285–86, 470

A.2d 585, 594 (1983); *In re Estate of Hillegass*, 322 Pa.Superior Ct. 139, 144–48, 469 A.2d 221, 224–25 (1983). *See also Matter of Estate of Blough*, 474 Pa. 177, 185, 378 A.2d 276, 280 (1977). A latent ambiguity exists "[w]here the words of a will are on its face plain, consistent and certain, and where the uncertainty arises from extrinsic facts or circumstances in relation to the property bequeathed." *Thomas Estate*, 457 Pa. 546, 551–52, 327 A.2d 31, 34–35 (1974). Once a latent ambiguity is found to exist, "parol evidence is admissible to explain or clarify the ambiguity." *Id.*

In the instant case, the plain language of the will states that appellee is to receive the testator's "home residence" and $20,000 "in accordance with the terms of our antinuptial [sic] agreement dated December 30, 1976." The antenuptial agreement, however, provides that, upon decedent's death, appellee is to receive "the residence property, free and clear of all encumbrances, *including the household furniture and furnishings* less certain items which will be designated for his child or grandchildren" and the $20,000. (Emphasis added). Thus, a latent ambiguity exists as to whether "home residence" includes the household furniture and furnishings. Keeping in mind that the testator's intent controls, we look to the circumstances surrounding the execution of the will and any other relevant facts.

Sometime prior to July 13, 1981, the decedent conferred with Timothy S. Sponseller, Esq., for the purpose of having the attorney prepare a new will for him. The will was executed by the decedent on July 13, 1981, and witnessed by Attorney Sponseller and Betty H. Ile. Sponseller testified that he had seen a copy of the December 30, 1976 antenuptial agreement in the files of the decedent's former attorney. Appellant testified that Sponseller had shown this copy to him in January of 1982. Thus, the lower court found that the attorney who drafted decedent's last will had seen and was familiar with the antenuptial agreement within six months of the execution of the will and at least three

months prior to decedent's date of death. On January 11, 1982, appellant wrote to decedent and, *inter alia,* stated:

Whatever you want for me as your heir, I will of course accept. Your desires as you have expressed them in your will are statements of love and generosity which mean more to me than you can possibly imagine.

The peculiar Pennsylvania law however will not permit it. I have researched that law and what it says simply stated is that:

A)—The surviving spouse can *elect* to accept the will or *take* 50% of the estate. Marriage agreements are not relevant.

(Emphasis in original). Appellant apparently had a close relationship with the decedent and regularly discussed business and family matters with him. There was no evidence, however, that the decedent relied upon appellant's advice concerning a spouse's right to elect to take against the will in Pennsylvania. Additionally, within one or two weeks of his death, the decedent in appellee's presence asked appellant to take care of appellee and appellant promised him that he would. Appellant later explained that he promised only to see that, as executor of the decedent's estate, appellee received everything that the decedent wanted her to have. Three or four days before the decedent's death on May 1, 1982, the decedent signed a list prepared by appellant and identified as "household furnishings and other items, referred to in the signer's will, as specified items which are not included with the residence at 542 Guilford Avenue." The items included on the list are the following:

Sterling Silver—Twelve—6 pc. Place Settings—Wallace—Grand Baroque w/chest

Two Plate Silver—Vegetable Dishes w/Covers

Spode Dishes (Buttercup Pattern)—complete service for twelve including Vegetable Dishes, Platters, Cream and Sugar, et cetera

Steinway Grand Piano—purchased by Margaret D. Geyer

Two Cellos

Antique Sofa

Duncan Phyfe Sofa

Two antique Queen Ann Chairs—purchased by Margaret D. Geyer

Bedroom Suite—Mahogany (left to Margaret D. Geyer as part of her inheritance from her Mother's estate)

Maple Rocker w/woven seat—from George C. Geyer Estate

Small Rocker w/woven seat—from childhood bedroom of George W. Geyer, II

Grandfather Clock—from George C. Geyer

Doulton Figurines—Male

Copper Washboiler (George C. Geyer Estate)

All Records of George W. Geyer, III (phonograph)

All Antique Crocks and Jugs from 68 South Second Street

Antique Chest from 68 South Second Street.

Oldsmobile Automobile

Geyer (George W. Geyer Family Bible)

German Bibles—Neusbaum Family

Exercycle

Pier Mirror from 68 South Second Street

George W. Geyer Books

Antique Child's Bed—above Garage

Although the antenuptial agreement does refer to "certain items which will be designated for his child or grandchildren," there is no reference in the decedent's will to any such list. The value of those household items listed was appraised at $7,790. Subtracting this amount from the value of all of the inventory of household furniture and furnishings, a total of $17,963.50, the value of those household goods which appellee was to receive was $10,173.50.

■ Considering the above circumstances, we think it clear that the decedent's intent was to comply with the December 30, 1976 antenuptial agreement in all respects by bequeathing to appellee his residence at 542 Guilford Avenue, *including* all the household furniture and furnishings, less those items specified on the list, and $20,000 cash. Therefore, construing the will according to the testator's

intent, we hold that appellee is entitled to receive the home, all the household furniture and furnishings not excluded by the list, and $20,000 in cash. Accordingly, we find no breach and direct the estate to carry out the decedent's intent to comply fully with the provisions of the antenuptial agreement. *See In re Estate of Cummings,* 493 Pa. 11, 425 A.2d 340 (1981).

Reversed and remanded for proceedings consistent with this opinion.

Jurisdiction is not retained.